IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Criminal Case //CC·/0070 PBS |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Count 1: 21 U.S.C. §§ 846 and |
| | ) 841(a)(1) – Conspiracy to |
| JOSEPH ZOLOT (1) | ) Distribute Methadone, |
| LISA PLINER (2), | ) Oxycodone, and Fentanyl |
| | ) |
| Defendants. | ) |
| | ) Counts 2-8: 21 U.S.C. § 841 – |
| | ) Distribution of Controlled |
| | ) Substances |

## INDICTMENT

**COUNT ONE:**    **(21 U.S.C. §§ 846 and 841(a)(1) -- Conspiracy to
                 Distribute Methadone, Oxycodone, and Fentanyl)**

The Grand Jury charges that:

### THE CONSPIRACY TO DISTRIBUTE CONTROLLED SUBSTANCES

1.    Beginning at a date unknown to the Grand Jury and
continuing up to on or about May 17, 2007, in Needham, in the
District of Massachusetts,

**JOSEPH ZOLOT and LISA PLINER,**

the defendants herein, did knowingly and intentionally conspire
with each other, and with other persons known and unknown to the
Grand Jury, to distribute methadone, and oxycodone, and fentanyl,
all Schedule II Controlled Substances, other than for a

legitimate medical purpose and in the usual course of
professional practice, and that methadone distributed by
defendants ZOLOT and PLINER did result in the deaths o the
following individuals who used methadone distributed by
defendants ZOLOT and PLINER:

   (1)   Dennis Dillon;

   (2)   Jeffrey Campbell;

   (3)   Thomas Dunphy;

   (4)   James Curley;

   (5)   Christopher Bartoloni; and

   (6)   Scot Poulack;

In violation of Title 21, United States Code, Sections 846,
841(a)(1)and 841(b)(1)(C).

## MANNER AND MEANS OF THE CONSPIRACY

### BACKGROUND

   2.   Defendants ZOLOT and PLINER provided prescriptions for
controlled substances to individuals through ZOLOT's medical
practice, which operated out of an office in Needham,
Massachusetts.  ZOLOT was a licensed physician during the
pendency of the conspiracy.  PLINER was a nurse practitioner who
worked with ZOLOT, and, as such, could write prescriptions.  The
prescriptions for controlled substances written by both ZOLOT and
PLINER included prescriptions for methadone, oxycodone and
fentanyl.  Many of these prescriptions were issued despite

- 2 -

indications that the individuals to whom the prescriptions were
being provided were abusing, misusing, or illegally distributing
drugs.  ZOLOT and PLINER prescribed controlled substances in
amounts and frequency that were likely to, and did in fact, cause
individuals to become dependent on those drugs, necessitating
return visits to ZOLOT and PLINER to obtain additional
prescriptions for controlled substances.  On a number of
occasions, the prescriptions issued by ZOLOT and PLINER resulted
in addiction, deteriorated health, overdose, and death.

      3.   The prescriptions for methadone, oxycodone, and
fentanyl were not issued by defendants ZOLOT and PLINER to many
individuals for legitimate medical purposes and were not issued
in the usual course of professional practice.  Rather, defendants
ZOLOT and PLINER provided the prescriptions to individuals for
their own financial gain.  Individuals were billed approximately
$300 for their initial visit to ZOLOT's medical practice, and
approximately $100-$150 for subsequent visits.  Individuals
commonly met with defendants ZOLOT or PLINER on at least a
monthly basis in order to receive prescriptions for controlled
substances.

      4.   During the conspiracy, defendants ZOLOT and PLINER met
with approximately 40 to 50 people a day at ZOLOT's medical
office in Needham.  ZOLOT and PLINER met with individuals to
provide prescriptions for controlled substances approximately

- 3 -

four days a week.  Individuals would frequently wait for hours in
ZOLOT's office in order to meet with either ZOLOT or PLINER.

5.    During their meetings with individuals seeking
controlled substances, defendants ZOLOT and PLINER would
frequently not conduct adequate physical examinations of the
individuals in order to diagnose and treat any alleged health
concerns of the individuals.  Meetings between the defendants and
individuals seeking prescriptions for controlled substances would
frequently last only short periods of time.  At the end of these
meetings, prescriptions for controlled substances would be
provided to the individuals by ZOLOT and PLINER.

6.    In furtherance of the conspiracy, ZOLOT and PLINER
frequently issued prescriptions for controlled substances to
individuals despite indications that such individuals were
abusing, misusing, or distributing controlled substances.  These
indications included, but are not limited to, the following:
requests for additional controlled substances by individuals
based upon claims of lost or stolen drugs or prescriptions; drug
screening tests conducted at ZOLOT's medical practice in which
the "patient" tested positive for controlled substances that were
not prescribed by either ZOLOT or PLINER; drug screening tests
conducted at ZOLOT's medical practice in which the "patient"
tested negative for the controlled substances prescribed by
either ZOLOT or PLINER, which indicated that the individual could

- 4 -

be misusing or diverting the prescribed controlled substances or attempting to circumvent the drug screening tests; inconsistent accounts by the individuals as to the cause of their claimed harm; and reports of prior history of drug addiction or the misuse of drugs and/or overt physical evidence of drug addiction.

### OVERDOSE DEATHS

7.   A number of individuals to whom prescriptions for controlled substances were provided by ZOLOT and PLINER died from drug overdoses, including the following:

### Dennis Dillon (age 36) - Died February 22, 2004

8.   Dennis Dillon began receiving prescriptions for controlled substances from ZOLOT's medical practice in approximately October of 2000, and he continued to receive prescriptions through on or about February 19, 2004, which was three days before Dillon's death.  During this time period, ZOLOT and PLINER provided Dillon with prescriptions for oxycodone and fentanyl.

9.   On or about February 19, 2004, ZOLOT provided Dillon with prescriptions for methadone and fentanyl.  This was the first time that Dillon had received a prescription for methadone from either ZOLOT or PLINER.  Dillon was 36 years old at the time of his receipt of the prescription.

10.   ZOLOT provided Dillon with prescriptions for methadone and fentanyl on or about February 19, 2004, despite receiving two

separate warnings from individuals associated with Dillon that they believed that Dillon had significant drug addiction problems that endangered Dillon's health.  These warnings were made within approximately a week of Dillon's death.  ZOLOT had also received an earlier warning from one of the individuals approximately one month before Dillon's death that Dillon was addicted to pain medications and Dillon was cutting open his fentanyl patches in order to access the contents.

11.  In addition to the warnings by the individuals associated with Dillon, on two prior occasions, Dillon had claimed that his medications had been stolen.  Such claims are a potential indication that an individual could be either abusing the prescribed medications, and seeking more of them, or seeking additional medications to sell.  Despite these claimed thefts, Dillon continued to receive prescriptions for controlled substances.

12.  In approximately 2001, ZOLOT received a letter from a drug utilization review examiner working for Dillon's insurer, that was being billed for prescribed medications, questioning his prescription practices in regard to Dillon.  ZOLOT did not respond to the letter.

13.  Approximately six months before Dillon's death, ZOLOT generated diagnostic notes which indicated that ZOLOT was aware that Dillon had a history of abusing pain medications.

14.   Dillon died from a drug overdose on February 22, 2004.
The methadone prescribed by ZOLOT was a cause of Dillon's death.

### Jeffrey Campbell (age 26) - Died March 25, 2005

15.   Jeffrey Campbell began receiving prescriptions for
controlled substances from ZOLOT's medical practice in
approximately late 2004, and he continued to receive
prescriptions through on or about March 22, 2005, which was three
days before Campbell's death.   During this time period, ZOLOT and
PLINER provided Campbell with prescriptions for oxycodone.

16.   On or about October 25, 2004, Campbell had his first
visit with ZOLOT and claimed to be suffering pain due to a fall.
ZOLOT prescribed oxycodone in the form of Percocet (1 pill a
day), and gave Campbell a prescription for 30 pills (i.e., enough
for 30 days).

17.   On or about November 9, 2004, Campbell had another
visit.   In his notes, ZOLOT stated that Campbell was suffering
back pain due to a car accident that occurred five months
previously - a claim contrary to the one provided by Campbell
approximately fifteen days earlier.   ZOLOT increased Campbell's
prescription to two Percocets a day and gave him a prescription
for 60 Percocets (i.e., enough for 30 days).   Thus, within
approximately two weeks, ZOLOT provided Campbell with
prescriptions for 90 Percocets.

18.  On or about November 29, 2004, approximately three weeks after the prior visit, Campbell had another appointment with ZOLOT, and, according to ZOLOT's notes, told ZOLOT that he had been involved in a car accident the night before.  ZOLOT increased Campbell's dosage to three Perocets a day, and prescribed another 45 Percocets.

19.  On or about December 8, 2004, approximately ten days after the last visit, PLINER reduced Campbell's dosage to two Percocets a day, and provided Campbell with a prescription for 60 Percocets (i.e., enough for 30 days).  Thus, within approximately ten days, ZOLOT and PLINER provided Campbell with prescriptions for 105 Percocets.  From Campbell's initial meeting with ZOLOT through this date, ZOLOT and PLINER had provided Campbell with prescriptions for approximately 195 Percocets.

20.  On or about March 22, 2005, ZOLOT provided Jeffrey Campbell with prescriptions for methadone and oxycodone.  This was the first time that Campbell had received a prescription for methadone from either ZOLOT or PLINER.  Campbell was 26 years old at the time that he received the prescriptions.

21.  ZOLOT prescribed methadone for Campbell on or about March 22, 2005, despite a drug screening test for Campbell, which was conducted on or about January 6, 2005, that came back negative for the controlled substances which Campbell should have been taking per the prescriptions issued by ZOLOT and PLINER.

This negative test result was an indication that Campbell could be misusing the prescribed drugs or diverting the prescribed controlled substances or attempting to circumvent the drug screening tests.

22.   On March 25, 2005, after being prescribed methadone for the first time, Campbell died from a drug overdose.   The methadone prescribed by ZOLOT was a cause of Campbell's death.

### Thomas Dunphy (age 49) - Died August 9, 2005

23.   Thomas Dunphy began receiving prescriptions for controlled substances from ZOLOT's medical practice in approximately 2002, and continued to receive prescriptions through on or about August 8, 2005, which was one day before Dunphy's death.   During this time period, ZOLOT and PLINER provided Dunphy with prescriptions for oxycodone and fentanyl.

24.   On or about March 1, 2004, pursuant to a prior drug screening test, Dunphy tested positive for cocaine, and negative for drugs that he had been prescribed.   Dunphy had not been prescribed cocaine by either ZOLOT or PLINER.   The positive test was an indication that Dunphy could be abusing drugs.   The negative test was an indication that Dunphy could be diverting the prescribed controlled substances.

25.   On or about March 25, 2004, Dunphy again tested negative pursuant to a drug screening test for the controlled substances that he had been prescribed.   This negative test

result was an indication that Dunphy could be misusing the
controlled substances that he was being prescribed by the
defendants or diverting the prescribed controlled substances or
attempting to circumvent the drug screening tests.

26.   On or about August 8, 2005, PLINER provided Dunphy with
prescriptions for methadone and oxycodone.   This was the first
time that Dunphy had received a prescription for methadone from
either ZOLOT or PLINER.   Dunphy was 49 years old.

27.   On or about August 8, 2005, PLINER provided Dunphy with
a prescription for methadone despite Dunphy testing positive for
methadone during a drug screening test that day.   This positive
test was an indication that Dunphy could be abusing drugs.
PLINER took Dunphy off some of the controlled substances that had
been previously prescribed for Dunphy by ZOLOT and PLINER
(including fentanyl), and provided Dunphy with prescriptions for
methadone, the drug for which he had tested positive, and
oxycodone.

28.   Dunphy died from a drug overdose on August 9, 2005.
The methadone prescribed by PLINER was a cause of Dunphy's death.

### James Curley (age 44) - Died October 14, 2005

29.   James Curley began receiving prescriptions for
controlled substances from ZOLOT's medical practice in
approximately May of 2002, and continued to receive prescriptions
through on or about October 13, 2005, which was one day before

Curley's death from a drug overdose.  Over this time period,

ZOLOT and PLINER provided Curley with prescriptions for oxycodone

and fentanyl.

30.  On or about August 24, 2004, Curley tested negative

pursuant to a drug screening test for the controlled substances

that he had been prescribed.  This negative test result was an

indication that Curley could be misusing the controlled

substances that he was being prescribed by the defendants or

diverting the prescribed controlled substances or attempting to

circumvent the drug screening tests.

31.  On or about December 20, 2004, Curley again tested

negative pursuant to a drug screening test for the controlled

substances that he had been prescribed.  This negative test

result was an indication that Curley could be misusing the

controlled substances that he was being prescribed by the

defendants or diverting the prescribed controlled substances or

attempting to circumvent the drug screening tests.

32.  On or about September 14, 2005, PLINER provided a

prescription for methadone to Curley.  Curley was 44 years old.

PLINER provided Curley with a prescription for methadone despite

Curley testing positive for both marijuana and methadone during a

drug screening test.  Curley had not previously been prescribed

methadone or marijuana by either ZOLOT or PLINER.  This positive

test result was an indication that Curley was potentially abusing

- 11 -

drugs.   PLINER did not provide Curley with prescriptions for
controlled substances that had been previously prescribed for
Curley by ZOLOT and PLINER (including oxycodone).

33.  On or about October 13, 2005, despite Curley's previous
positive drug test for methadone and marijuana, ZOLOT provided
Curley with prescriptions for methadone and oxycodone.   Curley
died from a drug overdose on October 14, 2005.   The methadone
prescribed to Curley by ZOLOT was a cause of Curley's death.

### Christopher Bartoloni (age 35) - Died January 14, 2006

34.  Christopher Bartoloni began receiving prescriptions for
controlled substances from ZOLOT's medical practice in
approximately November of 2003, and continued to receive
prescriptions through on or about January 12, 2006, which was two
days before his death.   Over this time period, defendants ZOLOT
and PLINER provided Bartoloni with prescriptions for methadone,
oxycodone, and fentanyl.

35.  On or about April 15, 2004, Bartoloni tested negative
pursuant to a drug screening test for the controlled substances
that he had been prescribed.   This negative test result was an
indication that Bartoloni could be misusing the controlled
substances that he was being prescribed by the defendants or
could be diverting the prescribed controlled substances or
attempting to circumvent the drug screening tests.

36.  On or about July 14, 2004, Bartoloni again tested negative pursuant to a drug screening test for the controlled substances that he had been prescribed.  This negative test result was an indication that Bartoloni could be misusing the controlled substances that he was being prescribed by the defendants or diverting the prescribed controlled substances or attempting to circumvent the drug screening tests.

37.  On or about March 1, 2005, Bartoloni again tested negative pursuant to a drug screening test for the controlled substances that he had been prescribed.  This negative test result was an indication that Bartoloni could be misusing the controlled substances that he was being prescribed by the defendants or diverting the prescribed controlled substances or attempting to circumvent the drug screening tests.

38.  On or about August 15, 2005, PLINER prescribed methadone for Bartoloni, who was 35 years old.  PLINER also provided prescriptions for oxycodone to Bartoloni.

39.  On or about August 15, 2005, PLINER gave Bartoloni prescriptions for controlled substances, including methadone and oxycodone, despite the fact that Bartoloni had three prior negative drug screening tests for controlled substances which Bartoloni should have been taking per the prescriptions already provided to Bartoloni.

40.   Approximately one month later, ZOLOT took Bartoloni off methadone after Bartoloni complained about side effects from the use of the methadone.   ZOLOT continued to provide Bartoloni with prescriptions for oxycodone.

41.   On or about October 13, 2005, despite a positive drug screening test result for methadone and cocaine, drugs that Bartoloni should not have had in his system, PLINER provided Bartoloni with a prescription for methadone, and ceased to provide Bartoloni with prescriptions for oxycodone.   The positive drug screening test result was an indication that Bartoloni was potentially abusing drugs.

42.   Defendants ZOLOT and PLINER continued to provide Bartoloni with prescriptions for methadone until Bartoloni's overdose death on January 14, 2006.   The methadone prescribed by the defendants was a cause of Bartoloni's death.

### Scot Poulack (age 39) – Died September 8, 2006

43.   Scot Poulack began receiving prescriptions for controlled substances from ZOLOT's medical practice in approximately 2003, and continued to receive prescriptions for controlled substances through on or about September 5, 2006, which was three days before Poulack's overdose death.   Over this time period, ZOLOT and PLINER provided Poulack with prescriptions for methadone, oxycodone, and fentanyl.

44.   On or about July 8, 2004, Poulack tested negative pursuant to a drug screening test for the controlled substances that he had been prescribed.   This negative test result was an indication that Poulack could be misusing the controlled substances that he was being prescribed by the defendants or diverting the prescribed controlled substances or attempting to circumvent the drug screening tests.

45.   In or about July 2004, pursuant to a drug screening test, Poulack tested positive for cocaine.   Poulack stated to ZOLOT that his cocaine use was accidental.   Poulack had not previously been prescribed cocaine by either ZOLOT or PLINER. This positive cocaine test was an indication that Poulack was potentially abusing drugs.

46.   On or about February 10, 2005, pursuant to a drug screening test, Poulack again tested positive for cocaine.   This positive cocaine test was an indication that Poulack was potentially abusing drugs.

47.   On or about March 14, 2005, Poulack again tested negative pursuant to a drug screening test for the controlled substances that he had been prescribed.   This negative test result was an indication that Poulack could be misusing the controlled substances that he was being prescribed by the defendants or diverting the prescribed controlled substances or attempting to circumvent the drug screening tests.

48.   On or about August 10, 2005, pursuant to a drug screening test, Poulack again tested positive for cocaine.   This third positive cocaine test was an indication that Poulack was potentially abusing drugs.

49.   On or about October 10, 2005, Poulack again tested negative pursuant to a drug screening test for the controlled substances that he had been prescribed.   This third negative test result was an indication that Poulack could be misusing the controlled substances that he was being prescribed by the defendants or diverting the prescribed controlled substances or attempting to circumvent the drug screening tests.

50.   On or about May 8, 2006, Poulack again tested negative pursuant to a drug screening test for the controlled substances that he had been prescribed.   This fourth negative test result was an indication that Poulack could be misusing the controlled substances that he was being prescribed by the defendants or diverting the prescribed controlled substances or attempting to circumvent the drug screening tests.

51.   On or about August 2, 2006, ZOLOT provided a prescription for methadone for Poulack, who was 39 years old, despite receiving the results of a drug screening test which indicated that Poulack had previously (1) used methadone, which had not been prescribed for Poulack by either ZOLOT or PLINER, and (2) not used the oxycodone that had been previously

prescribed for him.   ZOLOT prescribed methadone for Poulack despite Poulack admitting to ZOLOT that Poulack had obtained methadone illegally on the street.   The positive test result and admission of methadone use by Poulack were an indication that Poulack was abusing drugs.   In addition, the negative test result was an indication that Poulack could be diverting the controlled substances.

52.   On September 5, 2006, ZOLOT provided Poulack with prescriptions for methadone and oxycodone.

53.   On September 8, 2006, Poulack died from a drug overdose.   The methadone that was prescribed for Poulack by ZOLOT was a cause of his death.

COUNT TWO:        (21 U.S.C. § 841(a)(1) -- Distribution of
                  Methadone and Fentanyl)

The Grand Jury further charges that:

54.   Paragraphs 1 through 53 of the indictment are realleged
and incorporated into Count 2 of this indictment.

55.   On or about February 19, 2004, in Needham, in the
District of Massachusetts,

                  **JOSEPH ZOLOT and LISA PLINER,**

the defendants herein, did knowingly and intentionally distribute
methadone and fentanyl, both Schedule II Controlled Substances,
other than for a legitimate medical purpose and in the usual
course of professional practice, to Dennis Dillon, and the
methadone distributed by defendants ZOLOT and PLINER resulted in
the death of Dennis Dillon, who used the methadone.

All in violation of Title 21, United States Code,
Sections 841(a)(1)and 841(b)(1)(C), and Title 18 United States
Code, Section 2.

<u>COUNT THREE</u>:     (21 U.S.C. § 841(a)(1) -- Distribution of
                   Methadone and Oxycodone)

The Grand Jury further charges that:

56.   Paragraphs 1 through 53 of the indictment are realleged
and incorporated into Count 3 of this indictment.

57.   On or about March 22, 2005, in Needham, in the District
of Massachusetts,

                   **JOSEPH ZOLOT and LISA PLINER,**

the defendants herein, did knowingly and intentionally distribute
methadone and oxycodone, both Schedule II Controlled Substances,
other than for a legitimate medical purpose and in the usual
course of professional practice, to Jeffrey Campbell, and the
methadone distributed by defendants ZOLOT and PLINER resulted in
the death of Jeffrey Campbell, who used the methadone.

All in violation of Title 21, United States Code,
Sections 841(a)(1)and 841(b)(1)(C), and Title 18 United States
Code, Section 2.

COUNT FOUR:     (21 U.S.C. § 841(a)(1) -- Distribution of Fentanyl
                and Oxycodone)

The Grand Jury further charges that:

58.   Paragraphs 1 through 53 of the indictment are realleged
and incorporated into Count 4 of this indictment.

59.   On or about July 7, 2005, in Needham, in the District
of Massachusetts,

**JOSEPH ZOLOT and LISA PLINER,**

the defendants herein, did knowingly and intentionally distribute
fentanyl and oxycodone, both Schedule II Controlled Substances,
other than for a legitimate medical purpose and in the usual
course of professional practice, to Thomas Dunphy.

All in violation of Title 21, United States Code,
Section 841(a)(1)and Title 18 United States Code, Section 2.

COUNT FIVE:      (21 U.S.C. § 841(a)(1) -- Distribution of
                 Methadone and Oxycodone)

The Grand Jury further charges that:

60.  Paragraphs 1 through 53 of the indictment are realleged and incorporated into Count 4 of this indictment.

61.  On or about August 8, 2005, in Needham, in the District of Massachusetts,

**JOSEPH ZOLOT and LISA PLINER,**

the defendants herein, did knowingly and intentionally distribute methadone and oxycodone, both Schedule II Controlled Substances, other than for a legitimate medical purpose and in the usual course of professional practice, to Thomas Dunphy, and the methadone distributed by defendants ZOLOT and PLINER resulted in the death of Thomas Dunphy, who used the methadone.

All in violation of Title 21, United States Code, Sections 841(a)(1)and 841(b)(1)(C), and Title 18 United States Code, Section 2.

<u>COUNT SIX</u>:        (21 U.S.C. § 841(a)(1) -- Distribution of
                        Methadone and Oxycodone)

The Grand Jury further charges that:

62.    Paragraphs 1 through 53 of the indictment are realleged
and incorporated into Count 6 of this indictment.

63.    On or about October 13, 2005, in Needham, in the
District of Massachusetts,

**JOSEPH ZOLOT and LISA PLINER**,

the defendants herein, did knowingly and intentionally distribute
methadone and oxycodone, both Schedule II Controlled Substances,
other than for a legitimate medical purpose and in the usual
course of professional practice, to James Curley, and the
methadone distributed by defendants ZOLOT and PLINER resulted in
the death of James Curley, who used the methadone.

All in violation of Title 21, United States Code,
Sections 841(a)(1)and 841(b)(1)(C), and Title 18 United States
Code, Section 2.

<u>COUNT SEVEN</u>:     (21 U.S.C. § 841(a)(1) -- Distribution of
                Methadone)

The Grand Jury further charges that:

64.   Paragraphs 1 through 53 of the indictment are realleged and incorporated into Count 7 of this indictment.

65.   On or about January 12, 2006, in Needham, in the District of Massachusetts,

**JOSEPH ZOLOT and LISA PLINER,**

the defendants herein, did knowingly and intentionally distribute methadone, a Schedule II Controlled Substance, other than for a legitimate medical purpose and in the usual course of professional practice, to Christopher Bartoloni, and the methadone distributed by defendants ZOLOT and PLINER resulted in the death of Christopher Bartoloni, who used the methadone.

All in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C), and Title 18 United States Code, Section 2.

COUNT EIGHT:     (21 U.S.C. § 841(a)(1) -- Distribution of
                 Methadone and Oxycodone)

The Grand Jury further charges that:

66.    Paragraphs 1 through 53 of the indictment are realleged
and incorporated into Count 8 of this indictment.

67.    On or about September 5, 2006, in Needham, in the
District of Massachusetts,

**JOSEPH ZOLOT and LISA PLINER,**

the defendants herein, did knowingly and intentionally distribute
methadone and oxycodone, both Schedule II Controlled Substances,
other than for a legitimate medical purpose and in the usual
course of professional practice, to Scot Poulack, and the
methadone distributed by defendants ZOLOT and PLINER resulted in
the death of Scot Poulack, who used the methadone.

All in violation of Title 21, United States Code,
Sections 841(a)(1)and 841(b)(1)(C), and Title 18 United States
Code, Section 2.

A TRUE BILL

FOREPERSON OF THE GRAND JURY

Assistant United States Attorney

DISTRICT OF MASSACHUSETTS;      March 2, 2011

Returned into the District Court by the Grand Jurors and filed.

Deputy Clerk