UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
UNITED STATES OF AMERICA                  )
                                          )
v.                                        ) Criminal No. 11-CR-10070 (PBS)
                                          )
JOSEPH ZOLOT, M.D., et al.                )
_____)

**DR. JOSEPH ZOLOT AND NURSE LISA PLINER'S**
**OPPOSITION TO GOVERNMENT'S MOTION**
**TO PRECLUDE CERTAIN EXPERT TESTIMONY AT TRIAL**


Respectfully Submitted,


DR. JOSEPH ZOLOT,                         NURSE LISA PLINER,

By his attorneys,                          By her attorneys,


/s/ Benjamin J. Wish                       /s/ Michael J. Connolly
Howard M. Cooper (BBO #543842)             Michael J. Connolly (BBO #638611)
Benjamin J. Wish (BBO #672743)             Laura B. Angelini (BBO #658647)
TODD & WELD LLP                            HINCKLEY, ALLEN & SNYDER LLP
28 State Street                            28 State Street
Boston, Massachusetts  02109               Boston, Massachusetts 02109
(617) 720-2626                             (617) 345-9000
Attorneys for Joseph Zolot, M.D.           Attorneys for Lisa Pliner, N.P.

### i. Introduction

Dr. Joseph Zolot ("Dr. Zolot") and Nurse Lisa Pliner ("Nurse Pliner") respectfully submit this memorandum and the accompanying supplemental affidavits of proposed experts David M. Benjamin, Ph.D. ("Dr. Benjamin") and Yale H. Caplan, Ph.D. ("Dr. Caplan") in opposition to the Government's Motion to Preclude Certain Expert Testimony at Trial ("Motion"). The Government's motion is without merit in its entirety where it misapprehends, and indeed seeks to rewrite, both the standards for admissible expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Dr. Zolot and Nurse Pliner's actual expert disclosure ("Defendants' Disclosure"). Imagined legal standards applied to straw man opinions are not a basis upon which to challenge expert testimony.

Without citation, the Government argues that expert testimony can be excluded because, in its view, it is "wrong." Using this "standard," the Government contends, incorrectly, that proposed experts William McCarberg, M.D. ("Dr. McCarberg") and Carol Warfield, M.D. ("Dr. Warfield") are expected to opine that pain physicians currently practice under no requirements or standards and that this is "wrong." It is the Government which is wrong on all counts. Under *Daubert* and its progeny whether an expert opinion is correct is irrelevant to the admissibility of an opinion. *Daubert*, 509 U.S. at 596. Even if it were relevant, the opinions Drs. McCarberg and Warfield are actually expected to offer—that in 2002–2007 there were no standards or requirements for assessing whether medical professionals in pain management were acting as drug dealers—is correct.

Similarly, the Government incorrectly states that Drs. Caplan and Benjamin will offer opinions at trial as to the actual causes of the six charged deaths. Motion, at 13. Based upon this incorrect description of their proposed testimony, the Government then contends that neither expert is qualified to offer such opinions because they are neither forensic pathologists nor

1

medical doctors. *Id*. at 14.  The Government, however, misapprehends the opinions Drs. Caplan and Benjamin will offer. Put simply, there is a difference between opining as to the actual cause of death, which the Government's experts improperly do, and opining as to the existence of independently sufficient causes of death which negate but for causation.[1] Drs. Benjamin and Caplan are expected to opine as to the latter, not the former, and will further opine that the Government's experts have failed to properly consider those independently sufficiently causes of death. Further, their qualification to offer opinions is based not on a degree or title as the Government suggests, but rather on whether the opinion will be helpful to the jury based on "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. As set forth in their supplemental affidavits, Drs. Caplan and Benjamin are more than qualified to offer the opinions they are in fact expected to offer at trial.

The Court should deny the Government's motion in its entirety.

### ii. Relevant Facts Regarding the Defendants' Experts

On April 5, 2013, Dr. Zolot and Nurse Pliner disclosed to the Government four experts whom they expect to provide testimony at trial: Dr. Caplan, Dr. Benjamin, Dr. McCarberg, and Dr. Warfield. *See* Defendants' Disclosure, Appendix ("App.") Tab 7.[2] Drs. McCarberg and Warfield are expected to testify as to Dr. Zolot and Nurse Pliner's medical practices. Drs. Caplan and Benjamin are expected to provide testimony concerning the causation of the six charged deaths. Given the length of Dr. Zolot and Nurse Pliner's expert disclosure, this

---

[1] Dr. Zolot and Nurse Pliner have alerted the Court (Docket No. 133) to the United States Supreme Court's grant of certiorari in *United States v. Burrage*, 687 F.3d 1015 (8th Cir. 2012), a forthcoming decision which could change the landscape of the causation elements at issue here. Dr. Zolot and Nurse Pliner reserve all rights in this regard and note that if the Supreme Court holds that 21 U.S.C. §841(b) requires proof of proximate cause of death, then there will exist additional bases for excluding the Government's experts. They further note that if the Supreme Court holds that merely "contributing" to death is insufficient as a matter of law, than Richard Callery, M.D.'s opinions must be excluded, as he is expected to opine only that methadone contributed to the charged deaths.

[2] References to documents in the Appendix herein refer to the Appendix Dr. Zolot and Nurse Pliner submitted in support of their Motions to Exclude the Government's Experts (Dkt. No. 134).

Opposition will summarize only those opinions that the Government (after rewriting them) has moved to exclude.

## I. Drs. McCarberg and Warfield

Among other topics related to Dr. Zolot and Nurse Pliner's medical practice, Drs. McCarberg and Warfield are expected to testify about the extent to which policies, guidelines, and standards related to the treatment of chronic non-cancer pain in patients existed and were generally accepted both while Dr. Zolot and Nurse Pliner were practicing during the relevant time period (2002 through mid-2007) and currently, including the existence or absence of policies, guidelines, standards related to areas in which the Government's experts are expected to opine Dr. Zolot and Nurse Pliner did not act "appropriately."[3] Defendants' Disclosure at 6–7, 21–22, App. Tab 7. Their expected testimony will explain the differences in extant guidelines and standards during the time period of the charged conduct which will allow the jury to understand that the Government's experts seek, improperly, to hold the Defendants to "best practices" which did not even exist during the relevant time period.

Drs. McCarberg and Warfield are expected to testify that **"during 2002–2007, although some general policy materials guidelines existed that could apply to the treatment of pain management there was no accepted standard of care for how to treat chronic non-cancer pain."** *Id*. Further, they are expected to testify that "no requirements or obligations relating to the practice of pain management existed in 2002–2007 applicable to the assessment of whether a medical professional was acting in the usual professional practice." *Id*. They explain why each of the sources that the Government's experts reference did not provide such requirements or obligations. *Id.*, at 6–8, 21–23. Dr. Warfield's affidavit submitted in

---

[3] The Government does not challenge the qualifications of Drs. McCarberg and Warfield, recognizing that they are eminently qualified experts in the practice of pain management. The Defendants' Disclosure, App. Tab 7, sets forth a description of their respective qualifications.

support of Dr. Zolot and Nurse Pliner's motion to exclude the Government's proffered expert testimony regarding Dr. Zolot and Nurse Pliner's medical practice provides a further explanation of the reasons why the sources to which the Government refers in its expert disclosures set out solely suggestions for the better practice of medicine, not firm standards or requirements. *See* Affidavit of Carol Warfield, M.D. ("Warfield Aff."), App. Tab 58.

## II. Drs. Benjamin and Caplan

Dr. Benjamin is a clinical pharmacologist, clinical toxicologist, and forensic toxicologist who has practiced in those areas for over 40 years. Supplemental Affidavit of Dr. Benjamin ("Benjamin Supp. Aff.") ¶1. As he explains, clinical pharmacology, clinical toxicology, and forensic toxicology are related fields concerning the evaluation of how to most effectively use drugs to treat patients and whether an apparent adverse drug reaction, including death, was actually caused by a drug, rather than some unrelated medical circumstance. *Id*. ¶¶ 2–4. Throughout his career, Dr. Benjamin has made assessments of whether a medical condition unrelated to a drug caused or contributed to death or other conditions. *Id*. ¶4. Indeed, for twelve years he worked in the pharmaceutical industry where a primary part of his job was to report to the Food and Drug Administration ("FDA") about apparent adverse drug reactions, including how likely it was that the drug caused the observed reaction in light of the patient's clinical history. *Id*. ¶5. Dr. Benjamin has taught medical students and professional groups including the Massachusetts Medical Society about how to assess potential adverse drug reactions, including death, and in particular how to evaluate whether medical conditions unrelated to the drug caused that reaction. *Id*. ¶7.

Dr. Caplan is a forensic toxicologist with over 40 years of experience. Supplemental Affidavit of Dr. Caplan ("Caplan Supp. Aff.") ¶1. As a forensic toxicologist, he evaluates whether a death is due to the ingestion of a toxic substance, and necessarily includes

consideration of whether something other than a toxic substance caused the death. *Id*. ¶2. For example, during the twenty-two years that he was a forensic toxicologist at the Office of the Chief Medical Examiner, State of Maryland he worked as part of a team to determine the cause of death of countless decedents. *Id*. ¶3. To evaluate the extent to which a toxic substance may have played a role in causing a death he considered what factors other than toxic substances caused or contributed to that death, which was a crucial step in his determination of whether a drug contributed to death. *Id*. ¶3. Demonstrating his knowledge of pathology, Dr. Caplan has edited a treatise concerning both forensic pathology and forensic toxicology, Medicolegal Death Investigation: Treatises in the Forensic Sciences (2d Ed. 2006). He wrote two chapters in that treatise concerning forensic pathology, The Approach to Death Investigation and The Death Scene. *Id*. ¶5. He also taught courses relating to forensic pathology at the University of Maryland for seventeen years, including Gross Anatomic Pathology in Toxicology. *Id*. ¶4.

Among other opinions set out in the Defendants' Disclosure, Drs. Benjamin and Caplan are expected to testify that in large part due to the phenomenon of post-mortem redistribution ("PMR") there is no reliable scientific methodology for determining that methadone caused the six charged deaths. Defendants' Disclosure at 39–42, 44–47, App. Tab 7. They are further expected to testify that in each of the six deaths, factors other than methadone were sufficient on their own to cause the deaths—in four of the six deaths a controlled substance other than methadone—and that the Government's experts failed to consider or improperly considered those factors. *Id*. They are not, however, expected to testify as to what actually caused each of the six deaths. *Id*.

### iii. Procedural Background

On March 2, 2011, the Government charged Dr. Zolot and Nurse Pliner in an eight count Indictment alleging violations of 21 U.S.C. § 846 (Conspiracy to Distribute Methadone,

Oxycodone and Fentanyl) and 21 U.S.C. § 841 (Distribution of Controlled Substances). The Indictment alleges that Dr. Zolot and Nurse Pliner distributed controlled substances "other than for a legitimate medical purpose and in the usual course of professional practice," and that methadone which Dr. Zolot and Nurse Pliner distributed, not any other controlled substances, caused the deaths of six individuals whose names are set forth in the Indictment. The Government's suggestion in its motion that if it proves that "drugs" Dr. Zolot or Nurse Pliner dispensed resulted in death they face a mandatory minimum prison term of twenty years is incorrect. *See* Motion, at 2. The Indictment charges only that methadone, not any other "drugs," caused the charged deaths. The Indictment allegedly arises from the Defendants' pain management medical practice during the time period from 2002 to May 17, 2007.

### iv. The Government's Burden at Trial

**I.** **The Government's Burden to Prove Beyond a Reasonable Doubt That Dr. Zolot and Nurse Pliner Acted as Drug Dealers.**

To convict Dr. Zolot and Nurse Pliner, the Government must prove beyond a reasonable doubt that they distributed or dispensed a controlled substance knowingly and intentionally for other than legitimate medical purposes in the usual course of their professional medical practice. 21 U.S.C. § 841(a)(1); *United States v. Boettjer*, 569 F.2d 1078, 1082 (9th Cir. 1978) (explaining that a jury must find that a medical professional both distributed controlled substances for other than a legitimate medical purpose and outside the usual professional practice in order to convict); *United States v. Feingold*, 454 F.3d 1001, 1007–08 (9th Cir. 2006) ("[T]he district court must ensure that the benchmark for criminal liability is the higher showing that the practitioner intentionally has distributed controlled substances for no legitimate medical purpose and outside the usual course of professional practice."); *United States v. Veal*, 23 F.3d 985, 987–88 (6th Cir. 1994) (holding that to prove requisite intent the

Government had to prove that the defendant intentionally distributed controlled substances for other than a legitimate medical purpose and knew that the prescriptions were invalid).

The Government is incorrect that it must prove merely that Dr. Zolot and Nurse Pliner intentionally distributed controlled substances. It must prove that Dr. Zolot and Nurse Pliner's intent was to distribute controlled substances for other than legitimate medical purposes in the usual course of their professional medical practice, in other words to intentionally act as drug dealers. *See* Motion, at 3; *Feingold*, 454 F.3d at 1007–08; *Veal*, 23 F.3d at 987–88.

The Government's statement that it must prove only that Dr. Zolot and Nurse Pliner either distributed controlled substances for other than a legitimate medical purpose or outside the usual professional practice is also wrong. It must prove both. *Boettjer*, 569 F.2d at 1082.

In determining whether a medical professional acted outside the usual course of professional practices "[t]here are no specific guidelines . . . Rather, the courts must engage in a case-by-case analysis of evidence to determine whether a reasonable inference of guilt may be drawn from specific facts." *United States v. Singh*, 54 F.3d 1182, 1186-87 (4th Cir. 1995) (internal quotations omitted). That case-by-case determination is made under the principle that a medical professional may be convicted under 21 U.S.C. § 841(a)(1) "not when he is a bad or negligent physician, but when he ceases to be a physician at all." *Feingold*, 454 F.3d at 1011. In other words, to be found guilty of violating the CSA, a physician must have acted as a "drug dealer as conventionally understood." *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006).[4]

Courts use a variety of factors to assess whether a medical professional has acted as a drug dealer, but do not use those the Government sets out in its motion. Motion, at 4. None of the cases to which the Government cites rely on "patients paying in cash for office visits, early

---

[4] Dr. Zolot and Nurse Pliner respectfully refer the Court to their Memorandum in Support of Their (i) Omnibus Motion to Exclude Purported Expert Opinions Regarding Their Medical Practice and (ii) Request for an Evidentiary Hearing ("Medical Practice Memorandum") for a complete discussion of the legal framework for this analysis. Medical Practice Memorandum, at 25–28 (Dkt. No. 124).

prescription refills, excessively high dosages, claims of lost prescriptions or medication . . . improper utilization of urine testing for drugs, and failure to respond to indications of aberrant or abusive behavior." *See id*; *United States v. Moore*, 423 U.S. 122, 142–43 (1975) (upholding conviction of physician-defendant because he gave as much medication as requested, charged patients based on the number of pills desired and thus "acted as a large-scale 'pusher' not as a physician"); *United States v. Hooker*, 541 F.2d 300, 305 (1st Cir. 1976) (upholding conviction of physician-defendant, because defendant knew that the controlled substances he prescribed were not going to be used for therapeutic purposes and did not even try to discern what medical problems a patient might have); *United States v. Hitzig*, 63 Fed. Appx. 83, 88 (4th Cir. 2003) (upholding conviction because counsel conceded at oral argument that there was sufficient evidence in the record to establish defendant-physician acted outside the bounds of professional medical practice); *United States v. Rosen*, 582 F.2d 1032, 1036 (5th Cir. 1978) (setting out list of factors for determining validity of conviction under 21 U.S.C. § 841, including that a physician warned patients to fill prescriptions at different drug stores, but not the Government's suggested factors). Further, courts only use inadequate physical examination and patient histories to assess whether a medical professional acted as a drug dealer when the defendant typically conducted neither. *Moore*, 423 U.S. at 142–43; *Hooker*, 541 F.2d at 305.

Dr. Zolot and Nurse Pliner's good faith efforts to act in the usual course of professional practice is a complete defense to the charges against them. *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1138 (4th Cir. 1994). Indeed, "[c]ourts have consistently concluded that it is proper to instruct juries that a doctor should not be held criminally liable if the doctor acted in good faith when treating his patients." *United States v. Hurwitz*, 459 F.3d 463, 476 (4th Cir. 2006) (holding that district court "erred by concluding that good faith is not relevant when a registered physician is charged with violating § 841").

II.   **The Government's Burden to Prove Beyond a Reasonable Doubt That the Charged Deaths Resulted From Controlled Substances Dr. Zolot and Nurse Pliner Prescribed.**

To establish a mandatory minimum prison term of twenty years, the Government must prove beyond a reasonable doubt that death or serious bodily injury "result[ed] from" Dr. Zolot and Nurse Pliner's unlawful distribution of controlled substances. 21 U.S.C. § 841(b). The Government asserts that the statute requires only that it prove "but for" causation and cites to *United States v. Hatfield* for that standard. Motion, at 5. As the Court in *Hatfield* found, however, the Government cannot prove causation under the statute by proving the controlled substances were "a factor" or "played a part in the death or serious bodily injury." 591 F.3d 945, 948 (7th Cir. 2010). Rather, it must prove that absent the methadone the death would not have occurred. *Id.*; *see also Movitz v. Fist Nat. Bank of Chicago*, 148 F.3d 760, 762 (7th Cir. 1998) (defining "but for" causation as a "necessary condition").

## v.  Argument

I.   **The Opinions of Drs. McCarberg and Warfield Regarding Requirements and Best Practices Applicable to the Assessment of Whether a Medical Professional Acted As a Drug Dealer are Admissible.**

### a.   **The Admissibility of the Opinions of Drs. McCarberg and Warfield Does Not Depend To Any Degree Upon Whether The Government Believes Those Opinions Are Correct.**

The Government's effort to exclude a portion of Drs. McCarberg's and Warfield's opinions fails even without considering the substance of those opinions where the sole purported legal basis for exclusion has nothing to do with the admissibility of expert testimony under *Daubert*.[5] *See Daubert*, 509 U.S. at 591–92. The Government contends that the opinions of Drs. McCarberg and Warfield regarding the existence of "requirements or obligations

---

[5] Perhaps in an effort to draw upon some talismanic effect of the word, the Government calls the opinions of Dr. McCarberg and Warfield "unreliable," but it does not try to demonstrate in any respect that the opinions are actually unreliable. Instead, it spends four pages of the Motion arguing simply that some of the opinions of Drs. McCarberg and Warfield are wrong. *See* Motion, at 9–13.

relating to the practice of pain management" should be excluded, because they are "<u>improper and wrong</u>." Motion, at 13 (emphasis supplied). Whether an expert opinion is "wrong," however, is not a basis for exclusion under *Daubert*.[6] *See Daubert*, 509 at 596. "Admissibility does not turn on a determination by the trial court of which of several competing scientific theories has the best provenance, nor does it turn on convincing the trial court that the proffered expert is correct." *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 42 (1st Cir. 2013) (internal quotation omitted); *Milward v. Acuity Specialty Products Grp., Inc.*, 639 F.3d 11, 15 (1st Cir. 2011) ("So long as an expert's scientific testimony rests upon "'good grounds,' based on what is known," *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786, it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities, *id.* at 596, 113 S.Ct. 2786."). Tellingly, the Government does not cite a single case in support of its argument that a trial court may exclude expert testimony because it is "wrong." There is none. If the Government thinks Dr. McCarberg's and Dr. Warfield's opinions are incorrect it will have the opportunity to attempt to demonstrate that through cross-examination at trial.

### b. Drs. McCarberg and Warfield Are Not Expected to Offer the Opinions the Government Attributes to Them.

The opinion the Government claims is "wrong" <u>does not appear</u> in Dr. Zolot and Nurse Pliner's expert disclosures. The Government supposes that Drs. McCarberg and Warfield will testify that "no standards or obligations govern physicians practicing in the field of pain management."[7] Motion, at 13. Drs. McCarberg and Warfield are <u>not</u> expected to so testify. *See*

---

[6] Dr. Zolot and Nurse Pliner describe the bases for exclusion of expert testimony in full in their Memorandum in Support of their (i) Omnibus Motion to Exclude Purported Expert Opinions Regarding Causation of the Six Changed Deaths and (ii) Request for an Evidentiary Hearing ("Causation Memorandum") (Dkt. No. 126) and respectfully refer the Court to that discussion.

[7] The Government's attempt to foist this opinion about current standards or obligations on Drs. McCarberg and Warfield is the latest example of its attempt to apply irrelevant current standards and guidelines to conduct that

Defendants' Disclosure at 6–8, 21–23, App. Tab 7. Rather, Drs. McCarberg and Warfield are expected to testify that "during the 2002–2007 time period, although some general guidelines existed that could apply to the treatment of pain management <u>there was no accepted standard of care</u> for how to treat chronic non-cancer pain . . . . [and] no requirements or obligations relating to the practice of pain management existed in the 2002–2007 time period <u>applicable to the assessment of whether a medical professional was acting in the usual professional practice</u>," not as a drug dealer. *Id*. at 6, 21 (emphasis supplied).

In an apparent attempt to shoot down the straw man it creates by claiming Drs. McCarberg and Warfield are expected to opine that there were no medical guidelines "of any kind," the Government also misleadingly quotes from the Affidavit of Attorney Jennifer Bolen[8] (Dkt. No. 135-1) submitted in connection with a proceeding before the Massachusetts Board of Registration in Medicine ("BOR"). *See* Motion at 1, 10. Its attempt fails. Attorney Bolen's affidavit in the BOR proceeding supports, and does not contradict, the expected opinions of Drs. McCarberg and Warfield. Attorney Bolen in her affidavit described only "suggestions for assessing patients" during the 2002-2007 time period, and not any requirements for how a medical professional must respond to potential drug aberrant behavior. Bolen Aff. ¶53. Consistent with the expected testimony of Drs. McCarberg and Warfield, Attorney Bolen wrote that as of 2007, <u>after</u> the time period at issue, "[t]he only consensus I know of on addressing aberrant, drug-related behaviors is that something should be done, and that the something might

---

took place between 2002 and 2007. Medical Practice Memorandum (Dkt. No. 124) discusses the inapplicability of current guidelines, upon which the Government's experts rely, to assess whether Dr. Zolot and Nurse Pliner acted in the usual professional practice. Medical Practice Memorandum, at 24–30.

[8] The Government apparently intends to raise a meritless objection to Attorney Bolen's *pro hac vice* admission (Dkt. No. 135), including, refusing to agree to her admission so that she can participate in the May 14th Daubert hearing based upon her filing her affidavit in the BOR Proceeding. The Government apparently views the affidavit as inconsistent with the Defendants' proposed expert testimony. Putting aside that Attorney Bolen is a lawyer, not a doctor, and that the BOR administrative proceeding likely will not be admissible at trial under F.R.E. 403, there is nothing inconsistent in Attorney Bolen's affidavit. As described here, a fair reading of Attorney Bolen's affidavit reveals that it is entirely consistent with the expected testimony of Dr. Zolot and Nurse Pliner's experts and poses no conceivable conflict of interest.

be as simple as a discussion with the patient." Bolen Aff. ¶57. Also contrary to the

Government's misrepresentation in its motion, Attorney Bolen did not describe a "requirement"

to use only one physician to obtain controlled substances. Motion, at 10; Bolen Aff. ¶72.

Instead, she noted only that legal/regulatory material "suggests" patients "use one physician to

obtain controlled substances." Bolen Aff. ¶72. Although Attorney Bolen stated that physicians

should discuss "the risks and benefits of using the prescribed drugs" in any off-label manner,

she did so in the context of explaining that "off-label" prescribing is "very common" and that

"[p]hysicians have discretion to prescribe medication 'off-label.'" Bolen Aff. ¶ 61.

The Government's attempt to cherry pick out of context bits from Attorney Bolen's

affidavit in a disciplinary proceeding before the BOR utterly fails as a basis for excluding the

well-grounded opinions of two nationally prominent pain medicine experts.

> **c. The Opinions of Drs. McCarberg and Warfield That During the 2002–2007 Time Period There Were No Generally Accepted Practices or Requirements for Assessing Whether A Medical Professional Was Acting in the Usual Professional Practice Are Correct.**

Even assuming for the sake of argument that being "wrong" were a basis for excluding

expert testimony under *Daubert*, and it is not, the opinions that Drs. McCarberg and Warfield

are actually expected to provide at trial—rather than the ones the Government misdescribes—

are correct and solidly grounded in years of relevant and reliable experience and expertise. It is

correct that "no requirements or obligations relating to the practice of pain management existed

in the 2002–2007 time period applicable to the assessment of whether a medical professional

was acting in the usual professional practice." Defendants' Disclosures at 6, 21, App. Tab 7.

S.D. Passik, a pre-eminent voice in pain management, explained in 2002 with respect to pain

management: **"The 'norms' of drug taking and the epidemiology of aberrant drug-taking**

**behavior have not been clearly established. Therefore, clinicians generally lack**

**information to guide assessment of the severity of aberrant clinical occurrences."** S.D. Passik et al. *Pain clinicians' ranking of aberrant drug taking behavior*, 17 J. Pain & Palliative Care Pharmacotherapy 39, at 41 (2002), App. Tab 48. With respect to the role of drug testing in particular, during the time period of the charged conduct there were no extant "best practices, [evidence based medical standards], guidelines, or even consensus statements on the role of drug testing (urine or drug) in the management of chronic pain." Warfield Aff. ¶25, App. Tab 58. Indeed, no generally accepted clinical practices regarding the use of drug testing in clinical settings existed until at least February 2009. *Id*. ¶29.

The Government's Motion tacitly concedes that there was no law, regulation or guideline setting out requirements for how to respond to patients exhibiting potential drug aberrant behavior. *See* Motion, at 10 (noting that there was "no law, regulation, or guideline" requiring particular responses to a patient who abuses controlled substances). As one of the Government's experts, Edward Michna, M.D. ("Dr. Michna") himself wrote in 2007, <u>after all of the charged conduct at issue in this case allegedly took place</u>, treatment guidelines when a patient misuses opioids is a "largely unexplored research area." *Urine Toxicology Screening Among Chronic Pain Patients on Opioid Therapy: Frequency and Predictability of Abnormal Findings*, Edward Michna, et al., 23 *Cln J Pain* 2, p. 173, at 177 (Feb. 2007), App. Tab 46. Dr. Michna pointed out that reliance on "red flags" such as patients "who are preoccupied with opioids, request certain drugs, and require a high dose of medication . . . may prove to be incorrect." *Id*. When discussing how eight different physicians responded to an abnormal urine drug screen, Dr. Michna in fact noted that each one of them "has their own treatment style for addressing these behaviors. In general patients are seldom 'fired,' but opioids may be discontinued and the patient may be referred for substance abuse treatment if needed." *Id.* at 176 (emphasis supplied throughout).

13

The BOR Guidelines in particular do not provide evidence based medical standards ("EBMS"), best practices, or otherwise set requirements for how a medical professional must respond to particular medical challenges in patient care as they arise. *See* BOR Guidelines, App. Tab 9 and Tab 10; Warfield Aff. ¶22, App. Tab 58. For example, they do not set out how a physician must respond to a urine drug test showing that a prescribed medication was not detected. *See* BOR Guidelines, App. Tab 9 and Tab 10; Warfield Aff., ¶22, App. Tab 58. Indeed, the BOR Guidelines do not set any standard of care or identify best practices in the area of pain management. *See* BOR Guidelines, App. Tab 9 and Tab 10; Warfield Aff., ¶22, App. Tab 58. Though the BOR Guidelines suggest that to act in the usual course of professional practice there are some steps a medical profession should take in its effort to "<u>encourage</u> proper prescribing practices"—including that there be a physician-patient relationship and that the physician undertake an appropriate physical exam and medical history—the Government's disclosures referring to the BOR Guidelines do not identify any purported failure of Dr. Zolot or Nurse Pliner to take those basic steps with respect to particular patients. *See* BOR Guidelines at 1, App. Tab 9 (emphasis supplied); Initial Disclosure, App. Tab 1; Supplemental Disclosure, App. Tab 5.[9]

In a further tacit admission that requirements or guidelines for prescribing practices did not exist during the 2002–2007 time period, the Government cites to statutes and regulations that <u>set no requirements</u> for how a physician must, or should, prescribe controlled substances to patients—M.G.L. c. 112, §§ 2, 5, 5k and Mass. Regs. Code tit. 243, § 2.00, *et seq.*—to incorrectly suggest that "written regulations concerning physician prescribing practices *did exist*." Motion, at 10–11 (emphasis in original). M.G.L. c. 112, § 2 does not mention

---

[9] To the extent the Court determines that the BOR Guidelines or the other sources referenced in the Government's disclosures are relevant, Drs. Warfield and McCarberg will testify that Dr. Zolot and Nurse Pliner complied with the general guidelines and suggestions set out in those sources. *See* Defendants' Disclosure, App. Tab 7.

prescribing practices and relates to the process for applying for registration as a qualified physician and requirements for professional malpractice liability insurance. Section 5 similarly makes no reference to prescribing practices, but rather sets out disciplinary procedures for physicians. Section 5K also does not mention prescribing practices but instead states that the BOR may "promulgate rules and regulations relative to the prioritization of investigation of complaints and reports." Finally, Mass. Regs. Code tit. 243, § 2.00 sets out general requirements relating to "Licensing and the Practice of Medicine" and does not say anything regarding how a physician must prescribe controlled substances to patients. The Government's citation to these irrelevant statutes and regulations highlights its inability to cite anything actually constituting a relevant requirement during the relevant time period. *See* Motion, at 10–11. It is the Government's position that "written regulations concerning physician prescribing practices *did exist*" that is "improper and wrong." *See* Motion at 10–11, 13.

### d. The Opinions of Drs. McCarberg and Warfield Are Not Legal Conclusions.

The opinions of Drs. McCarberg and Warfield about the BOR Guidelines are not legal conclusions.[10] Drs. McCarberg and Warfield are expected to offer opinions regarding the extent to which the BOR Guidelines set out best practices, standards of care, requirements for the practice of pain management, or other medical standards or guidance. Defendants' Disclosures, at 8, 22, App. Tab 7. Such opinions amount to descriptions of professional industry standards about which experts offer opinions routinely, and are not inadmissible statements purporting to set out applicable principles of law. *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 79 (1st Cir. 2006)

---

[10] The Government appears to concede as much, as in its motion it states only that "to the extent the defendants seek to elicit opinions concerning the legal import of the policy, the Court must preclude them from doing so." Motion, at 11. Dr. Zolot and Nurse Pliner do not intend to elicit opinions concerning the "legal import" of the BOR Guidelines.

(holding that expert testimony regarding compliance with an industry standard is admissible and noting that "[e]xpert testimony on industry standards is common fare").[11]

Dr. McCarberg's and Dr. Warfield's opinions about the BOR Guidelines are not legal conclusions, because the BOR Guidelines are not law.[12] Rather, as the BOR Guidelines themselves explain, the purpose of the guidelines is "to encourage proper prescribing practices." BOR Guidelines at 1, App. Tab 9. The BOR Guidelines are not and do not purport to be a statute, regulation, or any other law. *Id.* For this reason, too, Dr. McCarberg's and Dr. Warfield's opinions about the BOR Guidelines are routine expert opinions about industry standards.[13]

## II.  Drs. Caplan and Benjamin Are Qualified to Testify That There Were "Independently Sufficient" Causes of Death Other Than Methadone, Which the Government's Experts Failed to Properly Consider.

### a.  Drs. Caplan and Benjamin Are Not Expected to Offer the Opinions the Government Has Moved to Exclude.

Drs. Caplan and Benjamin are not expected to testify to the opinion the Government has moved to exclude, "to tell the jury what they believe caused the deaths at issue." Motion, at 13. They are expected to testify—among other points described in Defendants' Disclosure—that

---

[11] Similarly, the expected testimony of Drs. McCarberg and Warfield that based upon objective indicia of a medical professional's acting in the usual course of professional practice, not as a drug dealer, Dr. Zolot and Nurse Pliner "prescribed controlled substances for legitimate medical purposes in the usual course of professional practice and the medical professional-patient relationship" is an admissible opinion. *See* Defendants' Disclosures at 9, App. Tab 7. Drs. McCarberg and Warfield are not expected to testify about "what the law required" or whether Dr. Zolot and Nurse Pliner complied with law, but rather about whether in their view Dr. Zolot and Nurse Pliner acted as medical professionals or as drug dealers. *See Nieves-Villanueva v. Soto-Rivera*, 133 F.3d. 92, 99 (1st Cit. 1997). In so doing, they consider factors from federal court decisions as to objective indicia about practices that distinguish a medical professional from a drug dealer. *See* Defendants' Disclosures at 9, App. Tab 7. The Government's experts fail to do so.

[12] *Arthurs v. Bd. of Registration in Medicine* and *Anusavice v. Bd. of Registration in Medicine*, upon which the Government relies, are not to the contrary. 383 Mass. 299, 312–13 (1981); 451 Mass. 786, 794–95 (2008). Those cases stand only for the unremarkable position that agencies may regulate through ad hoc adjudication. Of course, the BOR Guidelines are not an adjudication: they are guidelines.

[13] To the extent that the Court grants any weight to the Government's argument that proffered opinions about the BOR Guidelines are legal conclusions and therefore inadmissible, it should exclude or limit the opinions of the Government's experts purporting to apply the BOR Guidelines to the same extent it limits the testimony of Dr. Zolot and Nurse Pliner's experts.

there is no reliable scientific methodology for determining that opioids caused the charged

deaths based upon post-mortem blood levels and that factors other than pain medication Dr.

Zolot or Nurse Pliner prescribed were "independently sufficient" to cause the deaths and not

properly considered by the Government's proposed experts. Defendants' Disclosure at 39–42,

44–47, App. Tab 7. They are not expected to tell the jury that cocaine, degenerative heart

disease, or anything else other than methadone was the actual cause of any of the deaths.[14] *See*

*id*. The Court should deny the Government's motion to exclude the testimony of Drs. Caplan

and Benjamin on that basis alone.

> ### b. Drs. Caplan and Benjamin Are Qualified to Testify That Factors Other than Pain Medication Dr. Zolot or Nurse Pliner Prescribed Were Independently Sufficient to Cause the Six Deaths And Were Not Properly Considered by The Government's Experts.

To the extent the Government seeks to exclude the testimony Drs. Caplan and Benjamin

are in fact expected to provide, they are qualified to testify about what factors other than pain

medication Dr. Zolot or Nurse Pliner prescribed were independently sufficient to cause each of

the charged deaths and were not properly considered by the Government's experts. *See*

Benjamin Supp. Aff.; Caplan Supp. Aff.; *Daubert*, 509 U.S. at 591–92; Fed. R. Evid. 702.

Through their education, training, and experience, including working in conjunction with

physicians and forensic pathologists to ascertain the cause of death, Drs. Caplan and Benjamin

have garnered a wealth of knowledge regarding what factors may cause death that will make

their opinions helpful to the jury. Benjamin Supp. Aff.; Caplan Supp. Aff. Indeed, as a

necessary element of determining how drugs impacted or did not impact a decedent, forensic

toxicologists routinely consider whether factors other than drugs, for example degenerative

---

[14] Dr. Zolot and Nurse Pliner do not concede that Drs. Caplan and Benjamin are not qualified to testify to the actual cause of each of the six charged deaths. To the contrary, based on their qualifications, training, knowledge, and experience as described in their respective affidavits, they are so qualified. Dr. Zolot and Nurse Pliner reserve their right to supplement their disclosures of expert testimony to provide that Drs. Caplan and Benjamin are expected to testify as to the cause of each of the six charged deaths.

heart disease or sleep apnea, were themselves sufficient to cause death. Benjamin Supp. Aff., ¶¶2–4; Caplan Supp. Aff., ¶¶2–3. The bare fact that Drs. Benjamin and Caplan do not bear the label "forensic pathologist" does not erase their qualification for testifying about what factors were independently sufficient to cause the six charged deaths. Fed. R. Evid. 702.

Under Fed. R. Evid. 702, qualification to provide an expert opinion is not based on holding a particular degree or title, like forensic pathologist. Instead, "[t]he test is whether, under the totality of the circumstances, the witness can be said to be qualified as an expert in a particular field through any one or more of the five bases enumerated in Rule 702-knowledge, skill, experience, training, or education" such that his opinion is helpful to the jury. *Santos v. Posadas De Puerto Rico Associates, Inc.*, 452 F.3d 59, 63-64 (1st Cir. 2006) (holding that witness was qualified to testify in slip and fall case at swimming pool, though he had no experience in construction and design of swimming pools); *United States v. Hoffman,* 832 F.2d 1299, 1310 (1st Cir.1987) (holding that based solely on his experience DEA agent was qualified to testify as an expert about coded conversations between drug dealers since "[e]xpertise is not necessarily synonymous with a string of academic degrees or multiple memberships in learned societies"). Thus, "there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field." *Santos*, 452 F.3d at 63–64. Indeed, "expert witnesses need not have overly specialized knowledge to offer opinions." *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006); *Payton v. Abbott Labs,* 780 F.2d 147, 155 (1st Cir.1985) ("The fact that the physician is not a specialist in the field in which he is giving his opinion affects not the admissibility of his opinion but the weight the jury may place on it.").

In *Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion*, for example, the First Circuit Court of Appeals held that a non-gynecologist with almost no relevant experience

18

was qualified to testify about the detection of ectopic pregnancies because he had general medical education and training. 345 F.3d 15, 24-25 (1st Cir. 2003); *see Trafton v. Sunbury Primary Care, P.A.*, 689 F.Supp.2d 198, 203 (D.Me. 2010) (admitting expert testimony of family physicians to testify about psychiatric conditions, because of their experience and training in family medicine). There, in a medical malpractice case the court found that based on his general medical training the plaintiff's expert was qualified to testify about whether defendant-doctor should have detected plaintiff's ectopic pregnancy even though the expert was not a gynecologist, had performed just two pelvic examinations since his internship, and had <u>never</u> palpated an ectopic pregnancy. *Id*. Indeed, "it would have been an abuse of discretion for the court to exclude [plaintiff's expert's] testimony on the sole basis that his medical speciality was something other than gynecology or obstetrics." *Id*.

Along the same lines, in *Estate of Carlock v. Williamson* the court held that a non-physician electrical engineer was qualified as an expert to provide testimony about the need to perform cardiopulmonary resuscitation ("CPR") and other medical opinions based upon his experience and education as an electrical engineer. 2012 WL 75765, at *3 (C.D. Ill. Jan. 10, 2012). There, in a wrongful death case against defendant-law enforcement officers, the plaintiff alleged that defendants' use of an electric taser on the decedent, failure to perform CPR after the decedent's cardiac arrest, and physical mistreatment using a face-down restraint caused the death of the decedent. *Id*. at *1. The court held that the plaintiff's electrical engineer was qualified to testify about when the plaintiff's cardiac arrest occurred and that there was no medical risk to the face-down restraint defendants used, since "[t]he fact that [the offered expert] is not a medical doctor is not dispositive, so long as he has the relevant experience, knowledge or training to form his opinions." *Id*. at *2. The electrical engineer was qualified to provide the proffered medical opinions, the court explained, because his research related to the

development of electrical devices to diagnose and treat disease provided him the requisite knowledge, training, and experience to provide such opinions. *Id*. at *3.

Drs. Caplan and Benjamin are far more qualified to testify about what factors were independently sufficient to cause the six charged deaths than the non-gynecologist was to testify about an ectopic pregnancy in *Gaydar* or the electrical engineer was to testify about cardiac arrest in *Carlock*. 345 F.3d at 24-25; 2012 WL 75765, at *3. Unlike the experts in both of those cases, both Dr. Caplan and Dr. Benjamin have substantial experience in developing and relying on exactly the kind of opinion they will testify about at trial. Both made assessments about what factors other than drugs could have caused or contributed to death on a daily basis in their work. Benjamin Supp. Aff. ¶¶4–5; Caplan Supp. Aff. ¶3. Both have taught and published about the method for determining what factors caused or contributed to a death other than drugs. Benjamin Supp. Aff. ¶¶6–7; Caplan Supp. Aff. ¶¶4–5. Even putting all of that experience, knowledge, and training about non-drug causes of death to one side, in four of the six charged deaths here Drs. Benjamin and Caplan are expected to testify that a <u>drug</u> other than that Dr. Zolot of Nurse Pliner prescribed was independently sufficient to cause death. Defendants' Disclosure at 39–42, 44–47, App. Tab 7. In short, Drs. Caplan and Benjamin are qualified to testify about what factors other than methadone were independently sufficient to cause the six charged deaths.

## vi.  Conclusion

For all of the reasons set forth above, this Court should deny the Government's Motion to Preclude Certain Expert Testimony at Trial in its entirety. If the Court is not inclined to deny the Government's motion based upon the briefing and argument, Dr. Zolot and Nurse Pliner request an evidentiary hearing.

Respectfully Submitted,

DR. JOSEPH ZOLOT,                          NURSE LISA PLINER,

By his attorneys,                              By her attorneys,


/s/ Benjamin J. Wish                        /s/ Michael J. Connolly
Howard M. Cooper (BBO #543842)           Michael J. Connolly (BBO #638611)
Benjamin J. Wish (BBO #672743)           Laura B. Angelini (BBO #658647)
TODD & WELD LLP                          HINCKLEY, ALLEN & SNYDER LLP
28 State Street                          28 State Street
Boston, Massachusetts  02109             Boston, Massachusetts 02109
(617) 720-2626                           (617) 345-9000


Dated: May 10, 2013

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Benjamin J. Wish
Benjamin J. Wish

Dated:  May 10, 2013

21