## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                               )
UNITED STATES                  )
           Government,         )
                               )Criminal Action No. 11-10070-PBS
           v.                  )
                               )
JOSEPH ZOLOT and LISA PLINER,  )
           Defendants.         )
_____)
```

### MEMORANDUM AND ORDER

September 11, 2013

Saris, U.S.D.J.

### I. INTRODUCTION

Defendants Joseph Zolot, a physician, and Lisa Pliner, a nurse practitioner, are charged with illegal distribution of methadone, oxycodone, and fentanyl under the Controlled Substances Act ("CSA"), 21 U.S.C. § 841. They are also charged with conspiracy. The indictment alleges that defendants' illegal distribution of methadone resulted in the death of six patients.

Defendants have filed a motion to exclude the opinions of government experts, Dr. Michael Baden and Dr. Richard Callery, that methadone caused or contributed to the six deaths. They have also moved to preclude government experts Dr. Christopher Gilligan, Dr. Edward Michna, and Dr. Gerald Aronoff from testifying that defendants prescribed controlled substances without a legitimate medical purpose and outside the course of usual practice.

The government has moved to exclude the testimony of defendants' expert, Dr. Yale Caplan, that each of the six deaths had other independently sufficient causes of death. They also challenge the opinions of Dr. Carol Warfield and Dr. William McCarberg, who will testify that there were no standards for prescription practices in the field of pain management at the time of defendants' treatment.

After evidentiary hearings on May 28 and 30, 2013, and a review of the record and supplemental affidavits, Defendants' Motion to Exclude Expert Opinion Regarding Causation (Docket No. 125) is **ALLOWED IN PART AND DENIED IN PART;** Defendants' Motion to Exclude Expert Opinion Regarding Their Medical Practice (Docket No. 123) is **ALLOWED IN PART and DENIED IN PART**; and the Government's Motion to Exclude (Docket No. 122) is **ALLOWED IN PART and DENIED IN PART**.

## II. FACTUAL ALLEGATIONS

The following background facts, most of which are disputed, are alleged in the indictment.

Dr. Zolot, a licensed physician, operated a medical practice in Needham, Massachusetts. Nurse Pliner was a nurse practitioner licensed to write prescriptions. Defendants issued prescriptions for controlled substances to patients, despite indications that such individuals were potentially abusing, misusing, or illegally distributing these drugs. Between the years 2002-2007, defendants

2

distributed these drugs without a legitimate medical purpose. By providing only cursory examinations and investigations into patient history, defendants were able to see 40-50 patients a day, charging $300 for initial visits and $150 for follow-up visits. By prescribing excessive dosages of highly addictive drugs without a legitimate medical purpose, defendants encouraged drug dependency in order to ensure patients returned for further appointments. The government charges that defendants' illegal distribution practices led to the deaths of six patients[1] due to intoxication from methadone they prescribed.

## III. DISCUSSION

### A. The Court's Gatekeeping Role

The admission of expert evidence is governed by Federal Rule of Evidence 702, which codified the Supreme Court's holding in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), and its progeny. See United States v. Diaz, 300 F.3d 66, 73 (1st Cir. 2002). Rule 702 states:

> If scientific, technical, or other specialized knowledge
> will assist the trier of fact to understand the evidence
> or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion
> or otherwise, if (1) the testimony is based upon

---

[1] The deaths charged in the indictment are: Dennis Dillon, Jeffrey Campbell, Thomas Dunphy, James Curley, Christopher Bartoloni, and Scot Poulack.

sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The trial court must determine whether the expert's testimony "both rests on a reliable foundation and is relevant to the task at hand" and whether the expert is qualified. <u>Daubert</u>, 509 U.S. at 597; <u>Diaz</u>, 300 F.3d at 73. An expert's methodology is the "central focus of a Daubert inquiry," but a court "may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." <u>Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.</u>, 161 F.3d 77, 81 (1st Cir. 1998).

<u>Daubert</u> itself listed four factors which should guide judges in this determination: (1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; (4) the level of the theory's or technique's acceptance within the relevant discipline. <u>United States v. Mooney</u>, 315 F.3d 54, 62 (1st Cir. 2002) (citing <u>Daubert</u>, 509 U.S. at 593-94). "These factors, however, are not definitive or exhaustive, and the trial judge enjoys broad latitude to use other factors to evaluate reliability." <u>Mooney</u>, 315 F.3d at 62 (citing <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 153 (1999)).

The Court must, however, keep in mind the Supreme Court's admonition that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596. If an expert's testimony is within "the range where experts might reasonably differ," the jury, not the trial court, should be the one to "decide among the conflicting views of different experts." Kumho Tire, 526 U.S. at 153. "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." In re Viagra Prods. Liab. Litig., 572 F. Supp. 2d 1071, 1078 (D. Minn. 2008) (quoting Bonner v. Isp Techs., 259 F.3d 924, 929-30 (8th Cir. 2001)). As the First Circuit has stated:

> In short, Daubert neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.

Ruiz-Troche, 161 F.3d at 85. It is with these principles in mind that the Court assesses the motions.

## B. Causation Under the Controlled Substances Act

One testified dispute involves the standard of causation under the CSA. Under § 841(b) of the CSA, a defendant is subject to a sentencing enhancement "if death or serious bodily injury

results from the use of" drugs illegally disbursed by the defendant. Defendants argue that proof that methadone contributed to a patient's death is not sufficient to demonstrate that methadone was the cause-in-fact of death required by § 841(b). Instead, they contend that the controlled substance must be a necessary condition for death to occur, not that it simply played a part in the death. The government argues that proof that methadone was a contributory cause of death is sufficient to prove cause-in-fact and apply the sentencing enhancement.

The First Circuit has held, "What is required under the death-enhancing statute is that the government prove cause-in-fact, that is, that the decedent's death was caused in fact by his or her use of drugs that were distributed either by the defendant himself or by others in a conspiracy of which the defendant was a part." United States v. De La Cruz, 514 F.3d 121, 138 (1st Cir. 2008). The circuits have split on what constitutes sufficient evidence of causation under § 841(b). The Eighth Circuit has held that the  "results from" requirement for an enhanced sentence under § 841(b) is met by demonstrating the illegally distributed drug was a "contributing cause" of death. See United States v. Burrage, 687 F.3d 1015, 1021 (8th Cir. 2012) (citing United States v. Monnier, 412 F.3d 859, 862 (8th Cir. 2005)). In contrast, the Seventh Circuit rejected a jury instruction stating that an illegally distributed drug must be "a

6

factor" or "must at least have played a part in the death or in the serious bodily injury" to receive the enhancement. <u>United States v. Hatfield,</u> 591 F.3d 945, 947-48 (7th Cir. 2010). The Supreme Court has recently granted certiorari on the question "Whether a person can be convicted for distribution of [controlled substances] causing death utilizing jury instructions which allow a conviction when the [drug] that was distributed 'contributed to,' death by 'mixed drug intoxication,' but was not the sole cause of death of a person." <u>Burrage v. United States</u>, 133 S. Ct. 2049 (2013). Accordingly, this Court has stayed the trial, with the parties' agreement, until the Supreme Court decides the case.  In the interim, the Court will decide certain <u>Daubert</u> issues. However, final resolution of some issues await the Supreme Court's ruling.

**i. Dr. Richard Callery**

Dr. Callery concludes that methadone, combined with other narcotics, caused the death of the six victims listed in the indictment. While not challenging Dr. Callery's qualifications[2], defendants assert that Dr. Callery's opinion that methadone

---

[2] Dr. Richard Callery has been the Chief Medical Examiner for the State of Delaware since 1994. He is also the Director of the Forensic Sciences Laboratory. He is in charge of approximately 3,000 death investigations and 1,000 postmortem toxicology cases each year. Dr. Callery received his undergraduate degree from the University of Massachusetts, his MD from the American University of the Carribean, and completed a pathology internship at Tufts New England Medical Center.

merely contributed to a patient's death is not sufficient to demonstrate that methadone was the cause-in-fact required by § 841(b). Accordingly, they seek to exclude Dr. Callery's opinions on the ground that they are irrelevant.

Fed. R. Evid. 401 states that relevant evidence is that which has "any tendency" to increase or decrease the probability of a fact "of consequence in determining the action." Dr. Callery's opinion that methadone contributed to the six deaths makes it more probable that the methadone distributed by defendants was the cause-in-fact of their deaths. Even under the § 841(b) causation standard that defendants embrace, Dr. Callery's conclusions are still relevant to that determination. The motion to exclude Dr. Callery's opinions is **DENIED**.

### ii. Dr. Michael Baden

To prove that defendants' distribution of methadone was the cause of the patients' deaths, the government seeks to introduce the testimony of Dr. Michael M. Baden, a board certified forensic pathologist.[3] Defendants do not challenge Dr. Baden's

---

[3] Dr. Baden is a board-certified forensic pathologist, who was the Chief Forensic Pathologist for the New York State Police from 1985 until 2011. Prior to that he served in the Office of the Chief Medical Examiner in New York City in various roles. He has also served as President of the Society of Medical Jurisprudence and Vice President of the American Academy of Forensic Sciences. Dr. Baden was the chairperson of the Forensic Pathology Panel of the United States Congress Select Committee on Assassinations that investigated the deaths of John F. Kennedy and Dr. Martin Luther King, Jr. He has held numerous teaching positions and has been published in many national and

qualifications. Dr. Baden testified that "but for" a methadone

intoxication five of Dr. Zolot's deceased patients would not have

died. In his opinion one patient, James Curley, would not have

died "but for" the combination of methadone and oxycodone

intoxication. Defendants contend that Dr. Baden's opinions are

unreliable because they are partially founded upon faulty

methodology that analyzes postmortem blood samples from the

victims, which indicated high levels of methadone concentrated in

the blood. Because of a phenomenon known as postmortem

redistribution ("PMR"), they argue that postmortem blood

concentrations of drugs are not reliable indicators of the cause

of a patient's death.

   None of the experts disputes the basic scientific principles

governing PMR: "Post-mortem drug redistribution refers to the

processes by which the movement of drugs and other chemical

poisons between tissues, organs, and body fluids takes place

after death . . ."[4] "The rate and extent of this movement varies

_____

international medical journals. Several of his published articles
specifically analyze methadone-related deaths. Dr. Baden
testified that he has performed more than 20,000 autopsies
himself over the course of 50 years. He has supervised autopsies
many times that number. He has also investigated 1,000 to 2,000
drug overdose cases. Dr. Baden has testified in hundreds of other
trials, notably the O.J. Simpson trial and the John Belushi
trial.

   [4]D.S. Cook, R.A. Braithwaite, K.A. Hale, Estimating
antemortem drug concentrations from postmortem blood samples: the
influence of postmortem redistribution, 282 (J. Clin. Pathol.

according to several factors, including the nature of the drug
and the time interval between death and postmortem specimen
collection."[5] Due to PMR, the concentrations of drugs "obtained
from postmortem samples do not necessarily reflect the blood
concentrations at the time of death."[6] With methadone
specifically, drug concentrations tend to be significantly higher
postmortem as compared to antemortem concentrations.[7] This is
particularly true when using cardiac blood samples, which
generally yield higher drug concentrations than femoral blood

---

2000; 53:282-285).

[5] Id.

[6] Anne-Laure Pelissier-Alicot, Jean-Michael Gaulier, Pierre
Champsaur and Pierre Marquet, Mechanisms Underlying Postmortem
Redistribution of Drugs: A Review, 533 (Journal of Analytical
Toxicology, Vol. 27, Nov./Dec. 2003).

[7] See Dimitiri Gerostamoulos, Jochen Beyer, Voula Staikos,
Penny Taylor, Noel Woodford, Olaf H. Drummer, The Effect of the
Postmortem Interval on the Redistribution of Drugs: a Comparison
of Mortuary Admission and Autopsy Blood Specimens, 5 (Forensic
Sci. Med. Pathol. May 22, 2012) (Concentrations of methadone
"increase significantly after death.").

10

specimens.[8] Consequently, PMR "affects the interpretations of postmortem blood concentrations."[9]

Dr. Baden relied on postmortem blood samples to determine the concentration of methadone in the alleged victims' blood. The blood samples were taken at least one calendar day after death for all patients (Tr. 1-122-23)[10], potentially exacerbating the effects of PMR.[11] The blood samples from four of the six decedents were also drawn from the heart, which is generally understood to be a source more susceptible to PMR. (Tr. 2-37). See also Ledbetter v. Blair Corp., 2012 U.S. Dist. LEXIS 88789, at *16 (M.D. Ala. June 27, 2012) (finding forensic toxicologist's testimony on "the concentrations of drugs in [Plaintiff's] postmortem blood" met the requirements of Daubert and Rule 702,

---

[8] See Cook, supra note 4, at 282 ("[P]ostmortem cardiac blood concentrations were significantly higher than antemortem blood concentrations."); Richard W. Prouty & William H. Anderson, The Forensic Science Implications of Site and Temporal Influences on Postmortem Blood-Drug Concentrations, 245 (Journal of Forensic Sciences, JFSCA, Vol. 35, No. 2, March 1990) ("[I]n general, the femoral bloods were lower in concentration than that of the heart and subclavian specimens.").

[9] Gerostamoulos, supra note 7, at 1.

[10] Transcript notations for the Daubert hearings on May 28, 2013 and May 30, 2013 are indicated as follows: the first number indicates whether the transcript is from Day One or Day Two of the hearings; the second number indicates the page number or ranges.

[11] See Cooke, supra note 4 at 282 ("If the interval between sampling and death is [four hours], or greater, then considerable overestimation of drug concentration at death will result.").

11

and noting that peripheral blood samples taken ameliorated the
effects of postmortem distribution); Durham v. County of Maui,
729 F. Supp. 2d 1188, 1193 (D. Haw. 2010) (finding that expert
testimony regarding the concentration of marijuana in postmortem
bloodstream was "sufficiently reliable under Daubert" noting that
blood was drawn from subclavicular area away from heart, and body
was refrigerated to slow redistribution process).

Given the variability of postmortem blood concentrations,
many scientists have counseled caution regarding the use of
postmortem blood to determine a patient's cause of death.[12]
However, scientists advise only against using postmortem blood as

_____

[12] See C.M. Milroy, A.R.W. Forrest, Methadone deaths: a
toxicological analysis, 277 (J. Clin. Pathol. 2000; 53:277-281)
("A degree of caution must be exercised in determining fatal
concentration because of the phenomenon of postmortem
redistribution.");  R.E. Ferner, Post-mortem clinical
pharmacology, 440 (British Journal of Clinical Pharmacology,
66:4/430-443, 2008) ("[C]oncentrations measured after death
cannot generally be interpreted to yield concentrations present
before death."); United States Department of Health and Human
Services, Methadone-Associated Mortality: Report of a National
Assessment, SAMHSA Publication No. 04-3904, Substance Abuse
Treatment, Substance Abuse and Mental Health Services
Administration, 12 (2004) ("It is important to note that
postmortem blood concentrations of methadone do not appear to
reliably distinguish between individuals who have died from
methadone toxicity and those in whom the presence of methadone is
purely coincidental."); Cook, supra note 4, at 284 ("[A] high
degree of error can arise from attempting to predict antemortem
concentrations from postmortem concentrations . . . ."); Steven
B. Karch, Boyd G. Stephens, Toxicology and pathology of deaths
related to methadone: retrospective review, 13 (West J. Med.
2000; 172:11-14) ("The presence of methadone is often an
incidental finding during postmortem examination which is
unrelated to the cause of death.").

the sole determination for cause of death, rather than
discouraging the use of postmortem blood concentrations at all.[13]
Indeed, some scientists have noted that "estimations [of
antemortem drug concentrations from postmortem specimens] are
frequently made and, in certain situations and with proper
caution, may be quite useful."[14]

Both government and defense experts relied on a text
authored by Randall C. Baselt[15] to determine whether methadone
blood concentrations fell within a lethal or therapeutic range.
Dr. Baden noted that the Baselt text was "the bible of
toxicologists." (Tr. 1-37). In the chapter on methadone related
deaths, Baselt reports various ranges of postmortem methadone

---

[13] See Ferner, supra note 12, at 431 ("[A] positive result
from a qualitative test for the presence of a poisonous substance
is not sufficient of itself to establish that the poison caused
death . . . .") (emphasis added); Michael C. Letsky, Ross E.
Zumwalt, Steven A. Seifert, and Blaine E. Benson, Cause of Death
Conundrum With Methadone Use, 193 (Am. J. Forensic Meth. Pathol.,
Vol. 32, No. 2, June 2011) ("The cause of death cannot be solely
based on drug concentrations and it may not be possible to come
to a conclusion as to the 'the' cause of death and the forensic
pathologist must be content with 'a' cause of death.") (emphasis
added); Karch, supra note 11, at 12 ("Postmortem measurements of
methadone or its metabolite, or both, cannot be used in isolation
to identify which deaths are associated with methadone
toxicity.") (emphasis added).

[14] Prouty, supra note 8, at 244. See also id. at 268 ("It is
not the authors' intent to imply that heart blood concentrations
are of no probative value in postmortem investigations, for they
are of significant value.")

[15] Randall C. Baselt, Disposition of Toxic Drugs and
Chemicals in Man 1021 - 1025 (9th ed.).

blood concentrations in methadone-related deaths and averages the ranges to 0.4 - 1.8 mg/L.[16] See Trial Exh. 1 at 1023. In another report, Dr. Charles Winek reports ranges of methadone concentration as therapeutic, lethal, or toxic.[17] See Trial Exh. 9 at 9.

The government has presented reliable scientific literature to support its position that pathologists who examine the totality of the circumstances surrounding death may use postmortem drug concentrations in determining cause of death, as long as they account for the effects of PMR in their final

---

[16] Id. at 1023 (reporting on four studies that showed lethal methadone blood concentrations of 0.06 - 3.1 mg/L and 0.18 - 4.0 mg/L and with average methadone concentrations of 0.28 mg/L, 0.7 mg/L, and 1.3 mg/L, in contrast to non-methadone related deaths which had methadone blood concentrations of 0.03 - 0.56 mg/L and 0.18 - 3.0 mg/L with average methadone concentrations of 0.11 mg/L, 0.64 mg/L, and 1.1 mg/L).

[17] Dr. Winek calculated the lethal, toxic, and therapeutic ranges in µg/mL. All of the autopsy and toxicology reports discussed by the experts were calculated in ng/mL. As Dr. Caplan noted in his testimony, µg/mL can be converted to ng/mL by multiplying the values by one thousand. (Tr. 2-184-85). For ease of comparison to the current case, both the µg/mL printed by Dr. Winek and a conversion to ng/mL based on Dr. Caplan's testimony has been provided.

| Therapeutic or Normal | Toxic | Lethal |
|---|---|---|
| 0.075 - 1.10 µg/mL | 0.2 - 2.0 µg/mL | 0.4 - 1.8 µg/mL |
| 75 - 1100 ng/mL | 200 - 2000 ng/mL | 400 - 1800 ng/mL |

analysis.[18] Some courts have excluded testimony using postmortem
samples, but only where the expert failed to factor PMR into his
cause of death analysis. See, e.g., In re Digitek Prods. Liab.
Litig., 821 F. Supp. 2d 822, 839-40 (S.D. W. Va. 2011) (excluding
expert testimony regarding postmortem drug concentrations where
the expert had "done no PMR research," "could not testify as to
the meaning of [Plaintiff's] postmortem blood [drug]
concentration or whether it was affected by PMR," and, thus, "did
not adequately account for the PMR effect" and "struggled with
the concept."). For this reason, defendants' across-the-board
challenge to the use of postmortem blood concentrations fails.
The Court now addresses the testimony regarding the six deaths
with this methodology in mind to determine whether Dr. Baden had
sufficiently reliable data for his conclusions concerning the

---

[18] See Milroy, supra note 12, at 281 ("[T]he pathologist has
the advantage of examining the whole body, and can interpret the
toxicological findings in context."); Letsky, supra note 13, at
195 ("This case emphasizes the well established principal [sic]
in forensic pathology that determining the cause of death cannot
be solely based on a laboratory analysis of drug concentrations.
In particular, postmortem blood methadone concentrations must be
integrated in context of decedent's dose and dose regimen,
medical history, known and plausible pharmokinectic tolerance
models, postmortem changes, and circumstances of death before
assigning cause of death."); T. Hilberg, S. Rogde, & J. Morland,
Postmortem Drug Redistribution – Human Cases Related to Results
in Experimental Animals, 8 (J. Forensic Sci 1999; 44(1):3-9) ("In
many cases circumstantial evidence indicates whether death was
due to an intoxication."); The Forensic Toxicology Council,
Briefing: What is Forensic Toxicology?, 2 ("The pathologist
considers this [toxicology] information in the context of the
investigative and medical history of the case, and the findings
of disease or other medical conditions at autopsy.").

cause of the deaths.

### iii. The Six Deaths

To evaluate whether the amount of methadone in each patient's blood was lethal, Dr. Baden compared the postmortem blood concentrations to other methadone deaths reported in literature to see if the levels were consistent. (Tr. 1-18, 37, 47, 89). Autopsies revealed the following amounts for the decedents: Campbell 780 ng/mL; Dunphy 470 ng/mL; Curley 400 ng/mL; Bartoloni 950 ng/mL; Poulack 639 ng/mL; Dillon 580 ng/mL. The deceased methadone blood concentrations all fell within both the lethal and therapeutic ranges reported by both Winek and Baselt.

While acknowledging that a doctor cannot determine the actual level of methadone at the time of death due to postmortem redistribution, Dr. Baden explained that based on these ranges and given the other evidence from the autopsy and witness statements, he could determine methadone intoxication was the cause of death. (Tr. 1-100-01, 112, 139, 167). Indeed, for four of the six deaths Dr. Baden testified that knowing only that methadone was present in the victims' blood and not the specific concentration, he would still opine that the cause of death was methadone intoxication because of the other evidence surrounding the death. (Tr. 1-112, 136, 139, 147, 150-51, 163). For Dillon and Curley's deaths, he did rely on the relatively high levels of

methadone in combination with other factors to make his final conclusion. (Tr. 1-153-54, 158).

The defense argues that the overlap between the therapeutic and lethal levels of methadone precludes a reliable conclusion that methadone caused the deaths. It is true that the methadone concentrations of the decedents fall within both the therapeutic and lethal concentration ranges.  For this reason, defendants argue it is faulty methodology to determine whether each of these victims had lethal or therapeutic levels of methadone in their blood. Dr. Baden acknowledged that all of the victims' methadone levels could have been within a therapeutic range. (Tr. 1-136, 145, 149, 151, 155, 160). However, based on all the other factors present, he reasonably concluded methadone was the cause of death. (Tr. 1-1-136, 145-46, 149, 151, 155, 160). For example, Dr. Baden looked at the timing of the methadone prescription to see if the death fell within the induction period of treatment when death is most likely to occur (Dillon, Poulack); pathological evidence of pulmonary edema – a tell-tale symptom of methadone overdose (all decedents); the presence of a methadone bottle next to the body (Dillon); unaccounted-for methadone pills (Campbell, Curley, Poulack); witnesses who saw the decedent take methadone doses exceeding prescription limits (Dillon, Campbell, Bartoloni); the medical history of the decedent (Dillon, Dunphy); and the presence or absence of other drugs (all decedents).

17

Finally, defendants' challenges regarding the location and
timing of drawing the samples go to the weight of Dr. Baden's
opinion, but not its admissibility. See United States v. Mackay,
715 F.3d 807, 828-30 (10th Cir. 2013) (holding sufficient
evidence to find doctor's illegal prescription of controlled
substances caused victim's death despite conflicting testimony on
PMR, noting "[w]hen experts do not reach the same conclusion, the
jury is responsible for making credibility determinations, not
the court."); Adams v. Johnson & Johnson, 2009 WL 8652948, at *3
(S.D. Ill. July 15, 2009) (allowing evidence of postmortem
distribution noting that testimony goes "to the weight and not
the admissibility of the evidence sought to be excluded.").

In sum, Dr. Baden has provided sufficiently reliable data to
support his opinions that five of the six indicted deaths
resulted from methadone intoxication. His methodology is
consistent with the current scientific literature recommending
that pathologists look to the totality of the circumstances
together with postmortem drug concentrations to determine cause
of death. The motion to exclude Dr. Baden's opinion with respect
to the deaths of Dillon, Campbell, Dunphy, Bartoloni, and Poulack
is **DENIED**.

With respect to Curley's death, Dr. Baden has used
sufficiently reliable methodology and data to opine that Curley's
death was caused by a combination of methadone and oxycodone. He

18

opined that evidence of pulmonary edema, (Tr. 1-68), unaccounted-for methadone and oxycodone pills, id., and the presence of methadone and oxycodone in the blood, (Tr. 1-159), lead to his conclusion. However, Dr. Baden's testimony was less than clear as to whether methadone was the but-for cause of death, as opposed to the combination of methadone and oxycodone. (Tr. 1-159). Curley had 400 ng/mL of methadone, at the low end of the lethal range, and 339 ng/mL of oxycodone.  Dr. Baden testified that he thought the methadone played a greater role because of the relatively lesser amount of oxycodone and fentanyl present in the bloodstream. (Tr. 1-157, 159-60). Dr. Baden's opinion that methadone along with oxycodone caused Curley's death may be legally sufficient if the Supreme Court decides that a "contributing cause" is sufficient to demonstrate "but for" causation under the CSA. The Court defers ruling on the motion to exclude the expert's opinion regarding Curley's death. The opinion may be supplemented within 30 days after the Burrage opinion is issued.

**iv. Dr. Yale Caplan**

Defendants challenge the government's charge that methadone was the "but for" cause of the six indicted deaths through the testimony of Dr. Yale Caplan, a board-certified forensic toxicologist. His credentials as a forensic toxicologist are not

challenged.[19] Instead, the government argues that, as a toxicologist, Dr. Caplan is not qualified to determine the cause of death. The contention that only a forensic pathologist or medical examiner is qualified to determine the ultimate cause of death is unpersuasive. As a forensic toxicologist, he has the expertise to give an opinion as to cause of death when toxic substances (like methadone or cocaine) are involved.

### a. Chronic Cocaine Use

In four of the six deaths – Campbell, Dunphy, Bartoloni and Poulack – Dr. Caplan concluded that, to a reasonable degree of scientific certainty, chronic cocaine use was an independently sufficient cause of death. (Tr. 2-71, 73, 75-76, 82, 85, 91). Dr. Caplan described how the presence of benzoylecgonine ("BZE"), the cocaine metabolite, in these victims' bloodstream indicated that cocaine had recently been ingested. (Campbell, 576 ng/mL of BZE; Dunphy, 321 ng/mL of BZE; Bartoloni, 936 ng/mL of BZE; Poulack, 1000 ng/mL of BZE.) None of the victims had the parent cocaine substance in their bloodstream. See Def. Mot. in Limine, Exhs. 17, 19, 22, 23. A person who dies from an acute cocaine

---

[19] Most recently, Dr. Caplan served as the Laboratory Director at the Parole and Probation Division of Maryland's Public Safety and Correctional Services, until last year when the laboratory closed. Prior to that he worked at Quest Diagnostics Incorporated from 1988-1999 in various roles, including Director of Forensic Toxicology. Dr. Caplan worked for over 20 years in the Maryland Medical Examiner's office, eventually serving as Chief Toxicologist. He also served as president of the American Board of Forensic Toxicology.

intoxication will likely still have cocaine in his system, since the body has not had time to metabolize the drug. (Tr. 2-77, 79). Dr. Caplan explained that a person can die from chronic cocaine use without any cocaine in the bloodstream. (Tr. 2-77, 79).[20] Dr. Caplan did not use the exact amount of BZE or cocaine in the bloodstream to determine whether cocaine contributed to death. Caplan Supp. Aff. at ¶ 6. He explained that because cocaine and BZE are unstable antemortem and postmortem, the substances deteriorate quickly and at varying rates, making it difficult to provide any reliable range of lethal blood concentration.[21] Instead, toxicologists must rely on the presence of cocaine or BZE in the blood along with other factors.

Dr. Caplan explained that a chronic cocaine death would be accompanied by a number of heart changes or pathological evidence of cardiac distress. (Tr. 2-145, 167). Myocardial hypertrophy, which results in an enlarged heart, is one such pathological symptom of chronic cocaine toxicity leading to sudden death.[22] Dr. Caplan explained that cocaine use would be particularly

---

[20] See, e.g., Steven B. Karch, Cocaine Cardiovascular Toxicity, Southern Medical Association (2005).

[21] See Erin A. Kolbrich, et al, Major and Minor Metabolites of Cocaine in Human Plasma following Controlled Subcutaneous Cocaine Administration, 501 Journal of Analystical Toxicology, Vol. 30 (Oct. 2006); see also Karch, supra note 20 ("[B]lood cocaine concentration is not a valid indicator of toxicity . . ..").

[22] Id. at 795.

significant in a patient, such as one of the decedents, who already had a weakened heart, since cocaine affects heart functioning. (Tr. 2-72). In a supplemental affidavit, Dr. Caplan testified that all four decedents whose deaths he attributed to cocaine toxicity had "enlarged hearts." Caplan Supp. Aff. ¶¶ 12-15.

Significantly, Dr. Caplan agreed that methadone may have contributed to the four deaths, but in his view it was not the most significant factor. (2-85, 90, 141). Dr. Caplan concluded that Campbell, Dunphy, Bartoloni, and Poulack were all opioid-tolerant, since they had been taking a variety of opiate drugs over a period of time.[23] (Tr. 2-70, 75, 80-81, 90). Both Dr. Caplan and Dr. Baden testified that if a patient takes one form of opioid or opiate drug, it may create a tolerance with all opioids or opiates.[24] (Tr. 1-26, Tr. 2-52). However, the FDA warns that patients "tolerant" to other opioids may be completely

_____

[23] Opiates, such as morphine, heroin, or oxycodone, are drugs derived from poppy seeds. Opioids, such as methadone and fentanyl, are synthetic drugs made in a laboratory. (Tr. 1-35). As these distinctions do not affect any legal determinations, for the purposes of this opinion, the Court will use these terms interchangeably. E.g., opiate-tolerant vs. opioid-tolerant.

[24] Jonathan J. Lipman, The Methadone Poisoning Epidemic, The Forensic Examiner, 7 ("Tolerance is defined as a reduced response to one or more effects of a drug after repeated administration.").

"intolerant" to methadone.[25] One source submitted by the
government indicated a patient who is opioid-tolerant may be more
susceptible to methadone overdose than someone who is opioid-
"naive".[26] Dr. Caplan acknowledged some of the challenges with
cross-tolerance concerns between opioids. (Tr. 2-188). However,
he explained that the methadone levels in their blood fell within
the therapeutic range reported in the scientific literature. (Tr.
2-71, 90, 114, 141). See also Winek, supra note 17. Given the
four patients' previous use of opioids, Dr. Caplan concluded that
these patients could have withstood a higher dose of methadone
than someone who had never taken opioids. (Tr. 2-188).

Given the evidence of BZE and some indications of changes to
the heart, there is sufficient data to support Dr. Caplan's

---

[25] 2006 FDA Warnings Methadone Tablets, Gov't Resp. to Caplan
Aff., Exh 1 at 4 ("Patients tolerant to other opioids may be
completely intolerant to methadone. . . . Deaths have been
reported during conversion from chronic, high-dose treatment with
other opioid agonists. . . . A high degree of "opioid tolerance"
does not eliminate the possibility of methadone overdose.");
Lipman, supra note 24, at 7 ("In the case of methadone, tolerance
development is incomplete . . . ."); Lynn R. Webster, Maximizing
Safety with Methadone and Other Opioids, Pain Treatment Topics, 3
(July 2007) ("cross-tolerance is incomplete even for individuals
currently prescribed high doses of other opioids").

[26] Bill H. McCarberg, et al., The Safe and Effective Use of
Methadone in Primary Care, Medscape Education Neurology &
Neurosurgery, 7 (2011) ("The thing about methadone I would want
primary care doctors to understand more than anything is that
hurting someone on methadone is very counterintuitive. It's
exactly the person you think you can't hurt, the opioid-tolerant
patient, because methadone is sometimes upwards of 80% more
potent in an opioid-tolerant patient than it is in an opioid-
naive patient.").

conclusion that chronic cocaine toxicity was an independently sufficient cause of death for Campbell, Dunphy, Bartoloni and Poulack. The motion to exclude Dr. Caplan's testimony on this topic is **DENIED.**

**b. Fentanyl**

Dr. Caplan concluded that fentanyl was more likely to have caused Curley's death than methadone, and that, to a reasonable degree of scientific certainty, fentanyl was an independently sufficient cause of death. (Tr. 2-60-61).  He opined that Curley's death was a multi-drug overdose. In support of his conclusion, Dr. Caplan noted that fentanyl is eighty times more potent than methadone or oxycodone. (Tr. 2-59-60). He also relied on the high fentanyl-to-norfentanyl ratio in Curley's bloodstream. (Tr. 2-60). Norfentanyl is the metabolite breakdown product of fentanyl. Id. Compared to the 4.3 ng/mL in Curley's bloodstream, he only had .64 ng/mL of norfentanyl. (Tr. 2-128). His high fentanyl-to-norfentanyl ratio demonstrates that much of the fentanyl had not been absorbed yet, indicating an acute intoxication. (Tr. 2-123, 128). Additionally, Dr. Caplan concluded that Curley was opioid-tolerant prior to beginning his methadone treatment. (Tr. 2-58). Again, this tolerance could have put Curley's bloodstream methadone concentration within the therapeutic range. (Tr. 2-90).

Given Dr. Caplan's qualifications as a toxicologist,

defendants have provided sufficiently reliable methodology and data to support Dr. Caplan's conclusion that fentanyl intoxication was an independently sufficient cause of death for Curley. The motion to exclude Dr. Caplan's testimony on this topic is **DENIED.**

### c. Cardiovascular Disease

In the case of Mr. Dunphy, Dr. Caplan concluded that cardiovascular disease was an independently sufficient cause of death, in addition to chronic cocaine use. (Tr. 2-72). He stated that he relied upon the medical examiner's diagnosis to make this determination. (Tr. 2-72). However, he provided no support beyond the medical examiner's diagnosis for his own opinion that cardiovascular disease was independently sufficient to cause death. He presented no independent analysis.

Rule 703 allows an expert to rely on certain "facts or data" if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. This rule allows experts to rely upon the opinions of other experts to form their own conclusions, if that is common practice in the field. United States v. McGhee, 627 F.3d 454, 460 (1st Cir. 2010) ("Experts who testify regularly in court commonly and permissibly rely in some measure on information gathered by other experts."). Nonetheless, "[a] scientist, however well credentialed he may be, is not permitted

to be the mouthpiece of a scientist in a different specialty.

That would not be responsible science." <u>Dura Auto. Sys. of Ind.,</u>

<u>Inc. v. CTS Corp.</u>, 285 F.3d 609, 614 (7th Cir. 2002).[27]

Dr. Caplan testified that, in his experience, toxicologists

regularly rely on the medical examiner's diagnosis to determine

"whether a drug or something else may have caused the death."

(Tr. 2-72-73). Thus, in rendering his opinion about cocaine, Dr.

Caplan may properly rely on heart pathology reports to reach a

conclusion that cocaine contributed to the cause of death.[28]

However, he cannot simply repeat a medical examiner's opinion as

the only basis for his own opinion that there was another medical

cause of death, unless he has the expertise to independently

---

[27] <u>See also</u> <u>Member Services, Inc. v. Sec. Mut. Life Ins. Co.</u>
<u>of New York</u>, 2010 U.S. Dist. LEXIS 103776, at *91, (N.D.N.Y. Sep.
30, 2010) ("While an expert may rely upon another expert to form
an opinion under Rule 703, an expert may not merely recite
another expert's opinion as his own."); <u>Eberli v. Cirrus Design</u>
<u>Corp.</u>, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) ("expert must
make some findings and not merely regurgitate another expert's
opinion"); <u>Deutz Corp. v. City Light & Power, Inc.</u>, 2008 U.S.
Dist. LEXIS 110202, at *16 (N.D. Ga. 2008) ("While Rule 703
permits an expert to rely on 'facts or data' that are not
otherwise admissible into evidence in forming his opinion, it
does not permit an expert to simply parrot the opinions of other
experts."); <u>Louis Vuitton Malletier v. Dooney & Bourke, Inc.</u>, 525
F. Supp. 2d 558, 664 (S.D.N.Y. 2007) ("It is true that experts
are permitted to rely on opinions of other experts to the extent
that they are of the type that would be reasonably relied upon by
other experts in the field. But in doing so, the expert witness
must in the end be giving his own opinion. He cannot simply be a
conduit for the opinion of an unproduced expert.").

[28] <u>See</u> Karch, <u>supra</u> note 20 (cataloguing pathological changes
to heart to be considered alongside cocaine toxicology in
assessing cocaine-related deaths).

reach that conclusion. There is no evidence that Dr. Caplan is an expert in cardiovascular disease.  Thus, the motion to exclude Dr. Caplan's opinion that cardiovascular disease was an independently sufficient cause of Curley's death is **<u>ALLOWED</u>**.

### d. Sleep Apnea and Bipolar Disorder

Finally, Dr. Caplan concluded that sleep apnea and bipolar disorder were independently sufficient causes of death for Dennis Dillon, although he had no expertise in these medical areas. Dr. Caplan provided no evidence to support his conclusion that bipolar disorder was independently sufficient to cause death. The motion to exclude this opinion is **<u>ALLOWED</u>**. Similarly, Dr. Caplan provided little evidence to suggest why sleep apnea was independently sufficient to cause death. Dr. Caplan noted that when Dillon was found, he did not have his CPAC mask on. (Tr. 2-66). This device is used to help sleep apnea patients breath, and since Dillon was not wearing his sleep apnea mask, he was subject to lack of oxygen. (Tr. 2-66). However, Dr. Caplan provided no evidence to suggest that sleep apnea itself was the cause, and he admitted that few deaths are caused solely by sleep apnea. (Tr. 2-156). The motion to exclude Dr. Caplan from testifying that sleep apnea is an independently sufficient cause of death is **<u>ALLOWED</u>.**

### C. Legitimate Medical Purpose in the Usual Course of Professional Practice

Government experts, Drs. Gerald Aronoff, Christopher
Gilligan, and Edward Michna, analyzed patient files from
defendants' practice and concluded that they prescribed
controlled substances for these patients without a legitimate
medical purpose and outside the course of usual practice. While
not challenging their qualifications, the defendants seek to
exclude their opinions because 1) the sources cited by the
government do not establish a medical standard for pain
management; 2) the experts' conclusions are based on nothing but
their own say so; and 3) their opinions are based on unreliable
data, particularly urine drug tests. The parties did not seek an
evidentiary hearing.

Defendants seek to introduce the testimony of Drs. Carol
Warfield[29] and William McCarberg[30], who will testify, among other

---

[29] Dr. Carol Warfield is a full Professor at Harvard Medical
School. Dr. Warfield educates physicians currently serving
fellowships in pain medicine. She also periodically teaches
undergraduates at Harvard Medical School and anesthesia
residents. Dr. Warfield is board certified in Anesthesia and Pain
Medicine. She has two undergraduate degrees, one in math from
Jackson College and a Bachelor of Science degree in mechanical
engineering from Tufts University. She attended medical school at
Tufts University and received her MD in 1976. Dr. Warfield is a
practicing physician at Beth Israel Deaconess Medical Center and
started the pain center there in 1980. She served as its Director
of Pain Management and Vice Chairman of the Department for Pain
Medicine for about 20 years, at which time she became Chairman of
the anesthesia department. She has written more than 100 articles
and 4 books on pain management, including the Manual of Pain
Management.

[30] Dr. McCarberg is the Founder of the Chronic Pain
Management Program for Kaiser Permanente in San Diego,

things, that "although some general guidelines existed that could apply to the treatment of pain management, there was no accepted standard of care . . . [and] no requirements or obligations relating to the practice of pain management existed in the 2002-2007 time period applicable to the assessment of whether a medical professional was acting in the usual professional practice." Def. Mot. in Limine, Exh 7: 6, 21. While not challenging their qualifications, the government moves to exclude these opinions on the grounds that they are not based on reliable information and that defendants themselves have admitted there were standards of care.

i.    **Determining the Standard of Medical Care**

Under § 841 of the CSA, a medical practitioner with a DEA license may be convicted only if he intentionally prescribes a controlled substances for other than "a legitimate medical purpose in the usual course of professional practice." See United States v. Moore, 423 U.S. 122, 124 (1975) ("[R]egistered physicians can be prosecuted under § 841 when their activities fall outside the usual course of professional practice."); 21

---

California. Dr. McCarberg received his MD from Northwestern University Medical School. He is on the Board of Directors of the American Academy of Pain Medicine and previously served on the Board of Directors of the American Pain Society. He is President of the Western Pain Society and Adjunct Assistant Clinical Professor at the University of California at San Diego School of Medicine. He has authored many scientific articles, including topics on opioid treatment, and has given more than 250 presentations on pain management issues.

C.F.R. § 1306.04. "[T]he standard for criminal liability under §
841(a) requires more than proof of a doctor's intentional failure
to adhere to the standard of care." United States v. Feingold,
454 F.3d 1001, 1011 (9th Cir. 2006). See also United States v.
Tran Trong Cuong, 18 F.3d 1132, 1137 (4th Cir. 1994) (noting that
a criminal conviction "requires more" than a showing of
malpractice). Instead, "[a] practitioner becomes a criminal not
when he is a bad or negligent physician, but when he ceases to be
a physician at all." Feingold, 454 F.3d at 1011.

Nonetheless, courts have held "that it is appropriate in [§
841 cases] for the jury to consider the practitioner's behavior
against the benchmark of acceptable and accepted medical
practice." Id. Indeed, "only after assessing the standards to
which medical professionals generally hold themselves is it
possible to evaluate whether a practitioner's conduct has
deviated so far from the 'usual course of professional practice'
that his actions become criminal." Id. at 1007 (citing United
States v. Moore, 423 U.S. 122, 126 (1975)). Thus, while a breach
of the medical standard of care, without more, is not dispositive
in a § 841 case against a physician, the government must present
evidence of the standard of care to prove that a doctor is acting
without a legitimate medical purpose or outside of the course of
usual practice. See United States v. Wexler, 522 F.3d 194, 204
(2d Cir. 2008) ("While failure to comply with the standard of

30

care applicable to a medical specialty does not alone provide a
basis for concluding that a physician's activities fall outside
the usual course of professional practice, it surely is relevant
to that determination."); <u>United States v. Chube</u>, 538 F.3d 693,
698 (7th Cir. 2008) ("[I]t is impossible sensibly to discuss the
question whether a physician was acting outside the usual course
of professional practice and without a legitimate medical purpose
without mentioning the usual standard of care."); <u>United States
v. McIver</u>, 470 F.3d 550, 561 (4th Cir. 2006)
(upholding expert testimony regarding standard of care and noting
"it is the extent and severity of departures from the
professional norms that underpin a jury's finding of criminal
violations."); <u>Feingold</u>, 454 F.3d at 1011 ("Knowing how doctors
generally ought to act is essential for a jury to determine
whether a practitioner has acted not as a doctor, or even as a
bad doctor, but as a 'pusher' whose conduct is without a
legitimate medical justification.").

     Courts have upheld convictions where there was sufficient
evidence of physician behavior that demonstrated prescription
without legitimate medical purpose and outside the bounds of
professional practice, including the following situations: <u>United
States v. Elder</u>, 682 F.3d 1065, 1071 (8th Cir. 2012) (where
defendant did not maintain medical files of patients and rarely
saw patients himself); <u>United States v. Singh</u>, 390 F.3d 168, 179

(2d Cir. 2004) (where physician-defendant developed scheme for nurses to see patients and prescribe controlled substances and signed prescriptions without knowing identity of patients); United States v. Kaplan, 895 F.2d 618, 620-21 (9th Cir. 1990) (where physician-defendants' prescriptions were issued without physical examination or medical history, and where defendant issued up to 21 prescriptions in a month); United States v. Bartee, 479 F.2d 484, 489 (10th Cir. 1973) (where doctor told patients to fill prescriptions at different drugs stores, used street slang to refer to drugs, knew patients were prone to trade drugs, prescribed excessive dosages of controlled substances, and made no physical examinations).

The Supreme Court "has allowed juries to assess the prevailing standards of care among medical professionals in cases involving the criminal prosecution of licensed practitioners." Feingold, 454 F.3d at 1007 (citing Moore, 423 U.S. at 126). Cf. United States v. Lovern, 590 F.3d 1095, 1100 (10th Cir. 2009) (finding the question "what constitutes usual medical practice" properly remained within the province of the jury, not the government). Thus, to the extent both sides challenge the standard of care espoused by qualified experts "the proper response [is] to present evidence . . . of the purported disputes within the medical community." Feingold, 454 F.3d at 1007 n.1.

The standard of acceptable medical care must ordinarily be

32

established by expert testimony. <u>See</u> <u>Lama v. Borras</u>, 16 F.3d 473, 478 (1st Cir. 1994) (holding that "the trier of fact can rarely determine the applicable standard of care without the assistance of expert testimony"); <u>Patel v. Gayes</u>, 984 F.2d 214 (7th Cir. 1993) (holding that treating physicians' testimony regarding general standards of care is "classic" expert testimony"). <u>Cf.</u> <u>Levin v. Dalva Bros.</u>, 459 F.3d 68, 79 (1st Cir. 2006) ("Expert testimony on industry standards is common fare . . . ."). In a similar context, doctors commonly rely upon their experience and training to opine as to the medical standard of care. <u>See, e.g.</u>, <u>Pages-Ramirez v. Ramirez-Gonzalez</u>, 605 F.3d 109, 116 (1st Cir. 2010) (holding in a medical malpractice case that a doctor's "medical education and many years of experience in the field" was a sufficiently "reliable foundation" to testify on medical standard of care).

However, the opinion of an expert, no matter how qualified cannot simply be based on her say so. "[N]othing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997). The gate-keeping function of the trial court requires more than merely "taking the expert's word for it." Fed. R. Evid. 702 advisory committee's note (citing <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 43 F.3d 1311, 1319 (9th

Cir. 1995) ("We've been presented with only the experts'
qualifications, their conclusions and their assurances of
reliability. Under Daubert, that's not enough.")). "Experts may
testify on the basis of experience." Brown v. Wal-Mart Stores,
Inc., 402 F. Supp. 2d 303, 308 (D. Me. 2005).  However, "if the
[expert] witness is relying solely or primarily on experience,
then the witness must explain how that experience leads to the
conclusion reached, why that experience is a sufficient basis for
the opinion, and how that experience is reliably applied to the
facts." Id. (citing Fed. R. Evid. 702 advisory committee's note).

    ii.  **Standard of Medical Care for Pain Management**

    The government cites certain written standards establishing
the standard of medical care in the area of pain management.  Dr.
Aronoff relies upon the Federation of State Medical Boards'
("FSMB") Model Policy for the Use of Controlled Substances for
the Treatment of Pain ("Model Policy"). Drs. Gilligan and Michna
rely upon both current and historical versions of "(1) the
applicable labels and/or FDA warnings related to methadone
products, oxycodone products (including OxyContin), and fentanyl
products (including Actiq); (2) the Commonwealth of Massachusetts
Board of Registration in Medicine's Prescribing Practices Policy
and Guidelines, Policy 89-01 ("BOR Prescribing Practices
Policy"); and (3) Responsible Opioid Prescribing by Scott
Fishman, M.D." (Def. Mot. in Limine, Exh. 5, 2). The defendants

contend that these sources do not establish a medical standard of care.

The government highlights language from the BOR Prescribing Practices Policy demonstrating that the policy was meant to establish a standard of care for pain management physicians. The BOR Prescribing Practices Policy was adopted by the Commonwealth of Massachusetts Board of Registration in Medicine in August 1989. The goal of the policy is to inform "physicians as to the legal requirements upon them and the standards the Board applies in reviewing their prescribing practices." Id. at 2. The policy lists several indications of when a physician is not prescribing medication for a legitimate medical purpose.[31] Id. at 13-15. The policy also explains that "the physician must conform to certain minimum norms and standards for the care of patients." Id. at 14.

------

[31] The indications listed by the BOR Prescribing Practices Policy includes:

> a) Failure to follow at least minimum professional procedures . . . ; b) The physician permitting the patient to name the drug he desires; c) The physician expressing concern during a patient encounter as to how and where a prescription would be filled in a manner that does not indicate a good faith concern for his patient; d) Repeated refills over relatively short periods; e) General remarks of the physician indicating his or her experience with non-therapeutic uses of the drug and of drug enforcement actions and procedures; f) Failure to schedule appropriate additional appointments for return visits and other factors indicating a lack of interest in follow-up care; and g) Conversations and other circumstances that demonstrate that the physician knew that the drugs were not to be used for a therapeutic or medical purpose.

The policy then lists several behaviors that are required to meet "[a] minimum standard of proper medical practice." Id.  See also United States v. Hoffman, 2006 U.S. Dist. LEXIS 89926, at *12 (D. Me. Dec. 12, 2006) ("While violation of the [BOR Prescribing Practices Policy] is not determinative, depending on the regulation violated, on the issue of criminal liability under the CSA, it is relevant to aid the jury in assessing what constitutes a legitimate medical purpose and the usual course of professional practice.").

The government also relies on defendants' own statements to demonstrate that a medical standard of care existed at the time of defendants' treatment. In defending herself before the medical licensing board, defendant Pliner stated she and Dr. Zolot "understood that [they] had to be vigilant in [their] work with patients in order to prevent possible abuse and diversion of controlled substances." Gov't Opp. Mot. in Limine, Exh. H at 5. Both defendants said they took certain precautions to guard against abuse and diversion of drugs, including random urine testing[32], requiring patients to sign opiate agreements[33], and ceasing prescriptions for patients who demonstrated abuse or

---

[32] Gov't Opp. Mot. in Limine, Exh. H at 5.

[33] Dr. Zolot's Medical Peer Review Hr'g, Gov't Opp. Mot. in. Limine, Exh. I, at 44.

36

diversion.[34] In a previous trial defense expert, Dr. Warfield,
testified that, while "there's a whole continuum of . . . what's
under the standard of care" in the treatment of chronic pain, she
also acknowledged that "[t]here are things that fall outside the
standard of care." Def. Opp. Mot. in Limine, Exh. E at 91, 127.

Finally, the government relies on the book Responsible
Opioid Prescribing by Dr. Fishman was published in 2007. (Def.
Mot. in Limine, Exh. 38). The last charged death occurred in
2007.  The contents of this book have not been disclosed to the
Court. Without knowing what the book states, the Court has no
basis for concluding whether the experts can reasonably rely on
it for determining the standard of care for the years prior to
its publication. The ruling on whether experts may rely upon Dr.
Fishman's book is deferred until the government provides evidence
that the book reflects medical practices at the time of the
treatment described in the indictment.

In response to the government's position concerning the
medical standard of care, defendants argue that there were no
binding standards, requirements, or generally accepted practices
for how to treat patients with chronic pain at the time of
defendants' practice. Articles on the subject of pain management
note that the "norms of drug taking and the epidemiology of
aberrant drug-taking behavior have not been clearly established.

---

[34] Id.

Therefore, clinicians generally lack information to guide
assessment of the severity of aberrant clinical occurrences."[35]
Dr. Warfield also testified that there were no generally accepted
clinical practices regarding the use of drug testing until 2009.
Warfield Aff. ¶ 29. Further, defense experts Drs. Warfield and
McCarberg will both testify that the sources relied upon by the
government, the FSMB Model Policy and the BOR Prescribing
Practices Policy, are not intended to and do not (1) set any
standard of care, (2) establish any absolute course of care for
the specific challenges that arise in patient care, or (3)
identify best practices in the area of pain management. Instead,
they will describe how the FSMB Model Policy provides general
guidance and suggestions to encourage some level of consistency
in medical practice, while recognizing the physician's discretion
in medical decision-making. Indeed, the Model Policy states
explicitly that it "is not intended to establish clinical
practice guidelines nor is it intended to be inconsistent with
controlled substance laws and regulations." Model Policy at 2.

---

[35] S.D. Passik et al., Pain clinicians' ranking of aberrant
drug taking behavior, 17 J. Pain & Palliative Care
Pharmacotheraphy 39, 41 (2002). See also Edward Michna, et al.,
Urine Toxicology Screening Among Chronic Pain Patients on Opioid
Therapy: Frequency and Predictability of Abnormal Findings, 23
Cln. J. Pain 2 173, 177 (Feb. 2007) ("If it has been determined
that a patient misused their opioids, current literature,
unfortunately provides few treatment guidelines which are based
on empirical evidence. This is a largely unexplored research area
in opioid treatment, but a few general management principles do
apply.").

The government properly objects to the opinions of Drs. Warfield and McCarberg[36] to the extent they opine as to whether the BOR Prescribing Practices Policy is legally binding. See Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 99 (1st Cir. 1997) ("It is black-letter law that it is not for witnesses to instruct the jury as to applicable principles of law, but for the judge.") (quotations omitted). However, these expert opinions are admissible to the extent they are a description of medical standards for pain management in the relevant timetable. The motion to exclude the opinions of Drs. Warfield and McCarberg is **ALLOWED IN PART AND DENIED IN PART**.

   **a. Drs. Gilligan[37] and Michna[38]**

---

[36] To the extent the defendants have not identified the 1400 files reviewed by Drs. Warfield and McCarberg, the defendants must disclose the identity of those files to the government forthwith. See Gov't Mot. in Limine at 7.

[37] Dr. Gilligan is currently the Director for the Center for Pain Medicine at Massachusetts General Hospital ("MGH"). He received his MD from Yale Medical School and an MBA from Harvard Business School. He completed a postdoctoral fellowship in Pain Medicine at MGH and is currently the Director of Clinical Trials for MGH's pain management division. Dr. Gilligan has written numerous peer-reviewed publications, has given several presentations on pain management, including topics on methadone treatment, and is also an instructor in anaesthesia at Harvard Medical School. Defendants do not challenge Dr. Gilligan's qualifications.

[38] Dr. Michna is a practicing anesthesiologist at the Pain Management Center at Brigham and Women Hospital and a clinical staff physician at the Dana-Farber Cancer Institute. He received a law degree from Seton Hall University and a medical degree from New Jersey Medical School. Dr. Michna is currently an assistant

The government relies on its Rule 16 disclosures of Dr. Michna's and Dr. Gilligan's testimony as the bases for the reliability of their opinions. Defendants argue these disclosures are deficient. The disclosures provide summaries of the doctors' expected testimony. Dr. Gilligan reviewed thirty patient files and Dr. Michna reviewed sixteen different patient files. For each patient, the summaries state at the outset that both doctors will testify that the defendants' prescription of controlled substances to the patient was "outside the usual course of practice."[39] The summaries list various deficiencies with the defendants' treatment of the patient that lead the experts to conclude that prescriptions were administered outside the course of usual practice. The deficiencies include failure to respond to indicators that a patient was abusing or diverting controlled substances; failure to provide an adequate medical basis for the prescription of controlled substances; and inappropriate use of template language for physical examinations. Finally, each patient summary provides specific examples of these alleged

---

professor of anaesthesia at Harvard Medical School. He has given dozens of presentations and written numerous articles on pain management, including presentations on opioid treatment and prescriptions. Defendants do not challenge Dr. Michna's qualifications.

[39] After reviewing the file of David Brown, Dr. Gilligan did not find that defendants acted without legitimate purpose or outside the course of usual practice. (Def. Mot. in Limine, Exhs. 1, 6).

deficiencies in the defendants' practice.

Missing from the summaries is sufficient explanation as to the standard of care which should be applied for the treatment of pain when there is problematic behavior by patients. Some of the patient behavior described in these expert disclosures, such as seeking early refills, claiming medication was lost or stolen, and obtaining drugs from other sources, are indicators of "problematic opioid use" described in the BOR Prescribing Practices Policy. See BOR Prescribing Practices Policy at 38. However, the experts do not refer to specific standards in the BOR, or the other sources generally cited by the government, or even provide testimony themselves about accepted medical practice for responding to specific patient behavior. For example, with respect to one patient file, Dr. Gilligan observes that on April 6, 2004, he tested positive for cocaine, positive for methadone which he had not been prescribed, and negative for the oxycodone he was prescribed. On April 12, 2004, he again tested positive for cocaine. In June of 2004, Dr. Zolot notes these two positive cocaine tests and responds by taking the patient off of OxyContin and prescribing methadone. Based on these drug tests, Dr. Gilligan concludes that Zolot violated the standard of medical care by prescribing methadone. However, Dr. Gilligan does not provide testimony regarding the applicable standard of care that should be followed in pain management when a patient has positive

41

drug tests for cocaine.

After reading Dr. Michna's and Dr. Gilligan's summaries, the Court concludes they do not sufficiently articulate the standard of care they are applying to assess defendants' conduct as out of the course of usual practice in responding to the specific patients with problem behavior.  They must specifically cite the written standard they are relying on or provide testimony as to the accepted standard in the field. The motion to exclude the opinions of Dr. Michna and Dr. Gilligan is **ALLOWED** without prejudice because the standard of care relied upon is not always clear.[40] However, the government may supplement the opinions of both Dr. Michna and Dr. Gilligan, by explaining the medical standard of care upon which their conclusions are based within 60 days of this opinion.

### b. Dr. Gerald Aronoff[41]

---

[40] The defendants also challenged Dr. Gilligan's and Dr. Michna's opinions regarding the general prescribing practices of Dr. Zolot and Nurse Pliner because the sample size of files reviewed was too small and unrepresentative of the entire clinic practice. The government has represented that Drs. Gilligan and Michna will not testify as to the general prescribing practices in Dr. Zolot's clinic and will confine themselves to the actions described in those files actually reviewed. Accordingly, the Court does not address this argument.

[41] The Court did not receive a curriculum vitae for Dr. Aronoff. However, based on disclosures, Dr. Gerald Aronoff is a diplomate of the American Board of Pain Medicine and the American Board of Psychiatry and Neurology. He is also certified with the American Board of Forensic Medicine, the American Academy of Disability Evaluating Physicians, and the American Board of Independent Medical Examiners. Defendants do not challenge Dr.

Dr. Aronoff reviewed twenty-five patient files and did a better job in detailing the patient's history and specifying why the defendants' treatment was deficient, without legitimate medical purpose, and outside the usual course of practice for twenty-two patients. In a conclusion section, he states how defendants' behavior specifically violated the FSMB Model Policy. The Model Policy contains seven criteria by which to evaluate physician performance: Evaluation of the Patient, Treatment Plan, Informed Consent and Agreement for Treatment, Periodic Review, Consultation, Medical Records, and Compliance With Controlled Substances Laws and Regulations. For each file reviewed, Dr. Aronoff notes which of the seven criteria outlined in the Model Policy the defendants violated, illustrating the violation with specific evidence of defendants' treatment, and using the explicit language of the guidelines to frame the defendants' conduct.

This opinion is reliable because it applies the medical standard identified to the evidence elicited from defendants' patient files. The motion to exclude the opinion of Dr. Aronoff is therefore **DENIED**.

### iii. Urine Drug Tests

Finally, defendants challenge the government's expert

---

Aronoff's qualifications.

opinions to the extent they rely on the results of urine drug

tests ("UDTs") because the results of such tests were unreliable

for making clinical determinations during the relevant time

period. At the time of defendants' actions, the results of UDTs

had limitations. UDTs could not provide information on specific

drug dosage or frequency of use.[42] UDTs could result in false

positives,[43] as well as false negatives due to the low

sensitivity of the tests to certain drugs.[44] Accordingly,

scientific literature stressed caution in the use of UDTs in

clinical practice[45] and recommended that UDTs not be used in

isolation to determine whether a patient is abusing or diverging

---

[42] Douglas L. Gourlay, Howard A. Heit, and Yale H. Caplan, Urine Drug Testing in Clinical Practice: Dispelling the Myths & Designing Strategies, 12 (Ed. 3 2006) ("[A] UDT cannot indicate the amount of drug taken, when the last dose was administered, or the source of the drug.") [hereinafter Yale H. Caplan, Urine Drug Testing in Clinical Practice].

[43] Stephen George and Robin A. Braithwaite, Use of On-Site Testing for Drugs of Abuse, Clinical Chemistry 48:10, 1639–1646, at 1639 (2002) ("On-site testing for drugs of abuse . . . may yield false-positive or –negative results.").

[44] Forest Tennant, Urine and Blood Tests: Why and When to Use Each Test in Pain Treatment, Practical Pain Management, 18–26, at 18 (June 2007) ("On-site testing will not detect low levels of drugs. Consequently, a negative test may not necessarily mean non-compliance.").

[45] George, supra note 43, at 1639 ("[UDTs] need to be used with caution because a rapid but unconfirmed result may lead to misdiagnosis and inappropriate treatment . . . .").

drugs.[46]

Nonetheless, the scientific literature submitted by the defendants demonstrates that, while UDTs had limitations, when used properly in conjunction with other clinical information, they were useful in determining whether a patient is misusing, abusing, or diverting drugs.[47] Indeed, the literature particularly recommends drug screening through UDTs when a physician prescribes controlled substances to a patient.[48]

---

[46] George, <u>supra</u> note 43, at 1639 (On-site testing for drugs of abuse "provide only initial screening data . . . ."); Tennant, <u>supra</u> note 44, at 18 ("Final clinical decisions on drug abuse or non-compliance should not solely be made by on-site testing. On-site testing should be viewed as a preliminary screen and not a definitive test."); Yale H. Caplan, <u>Urine Drug Testing in Clinical Practice</u>, <u>supra</u> note 42, at 9, 11 (UDT testing "in isolation is often inadequate in a clinical practice . . . . Healthcare professionals should use UDT results in conjunction with other clinical information . . . .").

[47] George, <u>supra</u> note 43, at 1643 ("There are several situations where [UDTs] could be required, such as immediate clinical challenges of alleged or supposed drug abuse . . . ."); Yale H. Caplan, <u>Urine Drug Testing in Clinical Practice</u>, <u>supra</u> note 42, at 5 ("Appropriate use of [UDTs] may improve adherence monitoring of healthcare professionals and offer greater protection from drug misuse/addiction and diversion/trafficking . . . . A UDT can aid the healthcare professional to diagnose or disprove misuse of or addiction to illicit or non-prescribed licit drugs."); Tennant, <u>supra</u> note 44, at 27("Urine and blood tests have recently emerged as valuable clinical tools to enhance treatment and prevent abuse and diversion. They are a valuable adjunct to - but not a substitute for - the tried and true physical exam and history.").

[48] Yale H. Caplan, <u>Urine Drug Testing in Clinical Practice</u>, <u>supra</u> note 42 at 7, 17 ("[R]outine screening for a history of misuse or addiction in all patients is appropriate before prescribing any medication, especially a controlled substance. . . . [UDTs] can be a simple and effective tool for healthcare

Accordingly, to the extent the government experts have relied on UDTs used in the initial screening of patients and ongoing treatment, in conjunction with other clinical information, the testimony relying on UDT results is reliable.

The motion to exclude Dr. Aronoff's testimony is **DENIED.** The motion to exclude Dr. Michna's and Dr. Gilligan's testimony is **ALLOWED** without prejudice to supplementation.

### IV.  ORDER

The Motion to Exclude Expert Opinion Regarding Causation (Docket No. 125) is **ALLOWED IN PART AND DENIED IN PART**. The Motion to Exclude Expert Opinion Regarding Medical Practice (Docket No. 123) is **ALLOWED IN PART and DENIED IN PART**. The Motion to Preclude Expert Testimony at Trial (Docket No. 122) is **ALLOWED IN PART and DENIED IN PART**. Any supplementation regarding the cause of death shall be filed within 30 days of the Supreme Court opinion issued in Burrage v. United States, 133 S. Ct. 2049 (2013). Any supplementation regarding the standard of care shall be filed within 60 days of the date of this opinion.


      /s/ PATTI B. SARIS
      Patti B. Saris

---

professionals in the assessment and ongoing management of patients who will be, or are being, treated over the long term with opiods . . . ."); Tennant, supra note 44, at 18 ("It is highly recommended that [UDTs] be used in all new patients before opioids and other controlled substances are prescribed.").

Chief United States District Judge