## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Crim. No.  11-CR-10070-PBS** |
| | ) | |
| **JOSEPH ZOLOT (1)** | ) | |
| **LISA PLINER (2)** | ) | |

### GOVERNMENT'S OMNIBUS MOTION *IN LIMINE*

The Government respectfully moves this Court *in limine* to allow certain evidence and testimony that Government intends to elicit at trial.  Specifically, the Government moves the Court to (1) admit lay witness testimony about the physical condition of Defendants' patients; (2) admit testimony of an additional death; (3) admit evidence of Defendants' income and lifestyle; (4) admit the co-conspirator statement of Thomas Dunphy; and (5) limit the Defendants' opening statements to those facts they will prove at trial.

### I.    THE COURT SHOULD ALLOW THE GOVERNMENT TO ADMIT LAY OPINION TESTIMONY ABOUT THE PHYSICAN CONDITION OF DEFENDANTS' PATIENTS

The Government renews its motion to admit lay witness testimony regarding observations made by witnesses of the physical condition of patients of Defendants.  In this regard, the Government seeks to elicit testimony concerning whether patients were intoxicated or appeared to be abusing/misusing drugs.  The witnesses who would provide this testimony include: (1) a Boston Police narcotics detective, who went to Defendants' office in an undercover capacity; (2) a pharmacist, who encountered patients seeking to fill prescriptions; and (3) actual patients, who had prior experience with individuals abusing/misusing drugs.  This testimony is permissible lay opinion testimony under Rule of Evidence 701.

1

The Government would note that Defendants were allowed to admit lay opinion testimony through several of their witnesses at trial.  For example, a former Boston Police Officer was allowed to testify that he did not see any "drug addicts" in Defendants' waiting room.  In the same vein, office employees were allowed to testify as to their impressions of the people, including that they appeared "average" or "working-class" and that people visiting Defendants' office were in pain.  The evidence to be elicited by the Government is no different from the opinion evidence elicited by the defense and admitted at the prior trial.

## ARGUMENT

Defendants cannot legitimately dispute that a red flag for potential misuse and/or abuse of drugs is the physical appearance of individuals seeking prescriptions.  *See, e.g., United States v. Merrill*, 513 F.3d 1293, 1298 (11th Cir. 2008) (evidence of improper conduct by doctor included that the doctor "wrote prescriptions for patients whose behavior and physical appearance should have raised suspicion that they were addicted to controlled substances").  Evidence as to the suspicious appearance of Defendants' patients is relevant as it supports that Defendants were aware that a significant portion of their patients were potentially misusing or abusing drugs.

Along these lines, the Government intends to introduce testimony from multiple witnesses that visited Defendants' office while they were either intoxicated or sick from drug withdrawal.  Moreover, the Government anticipates that witnesses will testify that they personally observed other individuals in the waiting room who appeared to be misusing or abusing drugs, including people nodding off as they sat in the waiting room.  One of the witnesses whom the Government will call is Boston Police Detective Daniel Adams, who visited Defendants' office on a number of occasions in an undercover capacity.  Detective Adams has

2

extensive experience with individuals abusing or misusing drugs, and actually was involved in investigating drug crimes.  The Government further anticipates that a pharmacist will testify that the physical appearance of individuals seeking to fill prescriptions from Defendants was suspicious and called into question whether these individuals should be receiving controlled substances.[1]  Finally, the Government expects to introduce testimony from witnesses who visited Defendants' office that they observed individuals who appeared to be abusing/misusing controlled substances as they were intoxicated or appeared to be "dope sick."

This is the very type of lay opinion evidence which is admissible under Rule 701.  As stated by the Third Circuit, "… Rule 701's liberalization of the admissibility of opinion evidence is rooted in the modern trend away from fine distinctions between fact and opinion and toward greater admission, tempered with an understanding that the adversary process, and more specifically, cross-examination will correct any problems …."  *Asplundh Manufacturing v. Benton Harbor Engineering*, 57 F.3d 1190, 1195-96 (3d Cir. 1995).  The Third Circuit noted that the "prototypical example of the type of evidence contemplated by the adoption of Rule 701 relates to the appearance of persons or things, identity, the manner of conduct, competency of a person … and an endless number of items that cannot be described factually in words apart from inferences."  *Id*. at 1196.  "For example, a witness who testifies that an individual whom he saw staggering or lurching along the way was drunk is spared the difficulty of describing, with the precision of an orthopedist or choreographer, the person's gait, angle of walk, etc."  *Id*.; *see also*

---

[1]   The pharmacists had a legal duty, similar to Defendants' duty, to ensure that individuals were not abusing and/or misusing controlled substances dispensed at the applicable pharmacy.  *See, e.g., United States v. Irwin*, 661 F.2d 1063, 1070 (5th Cir. 1981) ("While the responsibility for the proper prescribing and dispensing of controlled substances is upon the physician, the regulation imposes a 'corresponding responsibility' upon the pharmacist who fills the prescription.").

*EEOC v. Sbarro's Italian Eatery*, 2003 WL 26084606 at *2 (D.Utah Sept. 15, 2003) ("Rule 701's 2000 amendment … does not prevent a fact witness from testifying about the 'prototypical examples' of Rule 701 evidence including the appearance and conduct of another person.") (citation omitted); *Brown v. Nabors*, 2011 WL 24443882 at *1 n.3 (M.D.Tenn. June 15, 2011) ("a lay witness is competent to testify that a person appeared intoxicated or was behaving strangely").

If witnesses have experience as to drug misuse or abuse, they can provide a lay opinion as to whether a specific person that they encountered was misusing or abusing drugs. *See, e.g., United States v. Paiva*, 892 F.2d 148, 157 (1st Cir. 1989) ("the individual experience and knowledge of a lay witness may establish his or her competence, without qualification as an expert, to express an opinion on a particular subject outside the realm of common knowledge"); *United States v. Maher*, 454 F.3d 13, 24 (1st Cir. 2006) ("Rule 701 … is meant to admit testimony based on the lay expertise a witness personally acquires through experience, often on the job."); *United States v. Baralto*, 535 Fed. Appx. 263, 273-276 (4th Cir. 2013). This evidence is both relevant and probative as it demonstrates that Defendants were providing prescriptions to individuals displaying signs of potential abuse/misuse of controlled substances and Defendants had notice that a significant segment of their patient population could be misusing and/or diverting drugs.

The Government would note that, at the prior trial, Defendants were allowed to elicit this very type of lay opinion testimony. For example, Defendants called two former Boston Police Officers as witnesses. One of these former officers was specifically asked: "Did you ever see anyone in the waiting room who you thought was a drug addict." *See* Transcript at 16-85:16-

17.[2]  Over the Government's objection, the former officer testified: "No."  *Id*. at 16-85:20.  The

other officer was asked: "… can you describe what the people were like in the waiting room?"

Over the Government's objection, the officer was allowed to testify: "Patients, just general

patients like I was, you know, nothing out of the ordinary."  *Id*. at 16-116:17-23.  Thus, both

officers were allowed to provide opinions as to the appearance of the people visiting Defendants'

office – opinions favorable to the defense.

Defendants also elicited testimony from two members of Defendants' staff as to the

appearance of people visiting Defendants' office.  In this regard, Defendants were allowed to

elicit lay opinion testimony that: (1) patients appeared to be in pain (*id*. at 16-134:16-23; 16-

151:9-152:14); (2) "the majority of patients were working-class people, just regular working

class" (*id*. at 16-151:5-7); (3) patients were "average … people coming from all the district of

Boston; people coming in pain" (*id*. at 16-201:24-25).

The above testimony, which was allowed at trial, is lay opinion.  It is no different than the

testimony proposed by the Government from its witnesses.  The Government's witnesses will

likely testify that they observed people who appeared to be abusing/misusing drugs (including

nodding off) – a fact that is directly contrary to the testimony elicited by Defendants.  Along

these lines, such testimony is not beyond the experience of people who have had interactions

with individuals abusing or misusing drugs.  In fact, the Government would note that, during

trial, one of the witnesses nodded off, which resulted in both defense counsel and the Court

forming an opinion that the person could have taken too much of their prescribed medications or

potentially other drugs/alcohol.  *See* Transcript at 13-16-21.

The fact that multiple witnesses observed similar conduct by people visiting Defendants'

---

[2] Citations to the trial transcript are as follows:  Transcript at [day]-[page]:[line(s)].

office is relevant and admissible evidence because it goes directly to Defendants' claimed "good faith" in prescribing controlled substances as it supports that a significant number of the people visiting Defendants were displaying signs of potential abuse/misuse.  Moreover, at trial, Defendants attempted to bolster their defense by eliciting testimony that their practice was no different than a practice at Beth Israel Hospital.  *See* Transcript at 16-179:23-180:18.  The Government should be able to introduce evidence to rebut this comparison in the form of the fact that people were nodding off in the waiting room and appeared to be abusing/misusing drugs – an atmosphere inconsistent with a legitimate pain medicine practice involved in the distribution of opioids.

## II.   THE COURT SHOULD ALLOW THE GOVERNMENT TO INTRODUCE EVIDENCE OF AN ADDITIONAL DEATH

This Court previously allowed the admission of evidence regarding seven deaths of individuals who received prescription drugs from Defendants.  These deaths included six individuals named in the Indictment (including Dennis Dillon who died in February 2004), and P.B., a female patient who died in April 2004.  The Government intends to introduce the death of an additional male patient, R.F., who died in March 2004.  R.F.'s death was the ***third*** suspicious death within a period of three months in early 2004.  Defendants took no steps to investigate these suspicious deaths or to review whether their prescriptions of powerful and dangerous opioids were possibly contributing to patient deaths.  This string of suspicious deaths is highly relevant evidence to prove Defendants' criminal intent in the distribution of opioids and to rebut Defendants' primary argument that they were seeking to properly treat people with opioids.

The Court excluded evidence as to the death of R.F. at the prior trial because there was no expert testimony concerning the death.  The Government intends to introduce testimony from

6

its expert, Dr. Christopher Gilligan, that there should have been a response by Defendants, as medical providers, to the recorded notice of R.F.'s death, especially in light of the fact that the notice claimed that R.F. had died due to being improperly prescribed opioids.

In order to minimize any prejudice arising from the admission of this evidence, the Court can provide appropriate limiting instructions to the jury as it did in the previous trial. The Court should not exclude evidence of R.F.'s death under Federal Rule of Evidence 403, especially in light of the fact that courts have allowed the admission of such evidence in similar cases. *See United States v. Bourlier*, 2013 WL 1979624 at *6 (11th Cir. May 15, 2013) (evidence of uncharged deaths was properly admitted in trial against a physician for drug trafficking).

## ARGUMENT

As this Court has already found, evidence of deaths occurring in Defendants' medical practice is relevant and admissible for a number of reasons. First, the Government must prove at trial that Defendants prescribed controlled substances without a legitimate medical reason and outside the usual course of professional practice. The fact that Defendants had notice of suspicious patient deaths and did nothing to follow up on the cause of those deaths supports the Government's argument that Defendants were not legitimately prescribing controlled substances (including methadone, oxycodone and fentanyl). As noted by the Eleventh Circuit, "the evidence of these patients' deaths could be considered by the jury when determining whether [the defendant] knew that his patients were misusing his prescriptions. As we have said, this is one factor that may suggest that [the defendant] distributed controlled substances without a legitimate medical purpose and outside the usual course of professional practice." *Id*.

As a second ground, Defendants will argue at trial that they prescribed controlled substances in good faith and, thus, cannot be found guilty of the pending charges. Evidence that

Defendants were aware of possible overdoses and overdose deaths involving their patients rebuts any good faith defense as Defendants continued to prescribe significant amounts of opioids to individuals.

Finally, courts have consistently found that the fact that an individual died is admissible to provide context as to why the individual is not testifying. *See United States v. Rivera-Gomez*, 67 F.3d 993, 997 (1st Cir. 1995) (evidence of death of individual admissible to prevent improper jury "speculation as to why the prosecution did not offer his testimony at trial") *overruled on other grounds by Jones v. United States*, 526 U.S. 227 (1999); *United States v. Accetturo*, 966 F.2d 631, 637 (11th Cir. 1992) (holding the fact of a witness's death admissible as "relevant to explain the fact that [the witness] did not testify" and to prevent the jury from speculating) (cited with approval in *Rivera-Gomez*).  Recently, in *Bourlier*, the Eleventh Circuit stated "evidence of these patients' deaths would have put to rest any idea that they were not called by the government to testify at trial because they only had good things to say about [the defendant physician]." *Bourlier*, 2013 WL 1979624 at *6.

Evidence of R.F.'s death, and Defendants' failure to review or follow-up on the death, is highly relevant evidence because: (1) the death occurred in early 2004 which is early in the charged criminal conspiracy involving Defendants; (2) the notice of death memorialized in R.F.'s medical file included a claim that opioids prescribed by Defendants had caused his death; and (3) the death occurred within months of two other suspicious deaths for which Defendants also received notice.

On or about February 22, 2004, Dennis Dillon was found dead in a family house in South Boston.  The Government intends to introduce the testimony Cheryl Lee Miller at trial, and expects that Ms. Miller will testify that, within a few months prior to Mr. Dillon's death, Ms.

Miller told Zolot that: (1) Mr. Dillon was addicted to his pain medications; (2) Mr. Dillon was cutting open his prescribed fentanyl patches and directly accessing the fentanyl; and (3) Mr. Dillon was not taking his medications as prescribed.  Cutting open fentanyl patches is very dangerous conduct that can result in an overdose death.  The Government further expects to introduce testimony that, approximately a week before his death, Joseph Dillon (Mr. Dillon's brother) and Ms. Miller both independently spoke to Zolot regarding concerns about Mr. Dillon abusing drugs.  The two informed Zolot that they believed that Dillon had significant addiction issues and Mr. Dillon's health was in danger due to the addiction issues.  Zolot told both Joseph Dillon and Ms. Miller that he would talk to Dennis Dillon and take care of the situation.

Contrary to his statements to Joseph Dillon and Ms. Miller, Zolot did nothing to address any potential dangerous addiction issues with Mr. Dillon.  Instead, on February 19, 2004, three days prior to his death, Zolot prescribed methadone for the first time for Mr. Dillon in addition to fentanyl patches.  Thus, after being made aware of Mr. Dillon's addiction problems and dangerous conduct, Zolot gave Mr. Dillon an even greater amount of opioids.  After Mr. Dillon died, both Joseph Dillon and Ms. Miller confronted Zolot regarding Mr. Dillon's death.  Zolot stated that he had heard about Mr. Dillon's death.  ***Zolot told Joseph Dillon that his brother "had problems anyway."***

R.F. was a male who began visiting Defendants' practice on or about January 7, 2004, complaining about shoulder and back pain from an accident in September of 2003.  R.F. died on or about March 7, 2004.  His death occurred within two months of his first visit to Defendants (he was not suffering from any terminal disease) and just a few weeks after Mr. Dillon died under suspicious circumstances.  The Massachusetts death certificate for R.F. identified that he died from acute cocaine and oxycodone intoxication – a drug overdose.

9

As background for this death, at his first visit, R.F. informed Zolot that R.F. had previously received OxyContin 40 mg pills (2 to 3 per day) from another physician for pain, but had not received any controlled substances in two months.  Thus, per his own disclosure, R.F. was not opioid-tolerant as he had not been using opioids for a period of months.  R.F. took a drug test during his first visit which indicated that R.F. had no drugs in his system.

Five days after R.F.'s first visit, Zolot prescribed him 90 OxyContin 40 mg pills and 36 Actiq 400 mcg lozenges.  Actiq is a powerful fentanyl lozenge.  The label expressly states that: "Actiq is indicated only for the management of breakthrough cancer pain in patients with malignancies who are <u>already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain</u>." (emphasis in original).  The label further expressly warns: "Because life-threatening hypoventilation could occur at any dose in patients not taking chronic opiates, Actiq is contraindicated in the management of acute or postoperative pain.  This product must not be used in opioid non-tolerant patients."  Zolot prescribed Actiq to R.F. in a manner which was directly contrary to the approved use of the drug and which posed a danger to R.F.

At R.F.'s next visit on or about February 10, 2004, Zolot effectively *doubled* R.F.'s prescription for Actiq by prescribing 60 lozenges, and continued to prescribe 90 OxyContin 40 mg pills (which is a substantial amount of oxycodone independent of the fentanyl).  Zolot did not identify in R.F.'s medical file the significant increase in the Actiq prescription, but rather noted that "he will continue with the pain medicine."  R.F. returned to Zolot's office 21 days later (an early visit) and received the same prescriptions -- this early visit resulted in R.F. obtaining over a week's worth of additional OxyContin and Actiq.  In the medical note for this visit, Zolot again failed to properly record the medications R.F. was receiving by noting that R.F. would "continue

with the Percocet and OxyContin." R.F. was not receiving Percocet, but rather Actiq, a far more powerful opioid.

Less than two weeks after this visit, per a handwritten note affixed to the front of R.F.'s file, Zolot's office received a phone call from a woman claiming to be R.F.'s wife in which the woman claimed that R.F. had died and that she believed that Zolot had been responsible. The note in the file is dated March 16, 2004 and states:

> Died of Sleep Apnea[3]

> Wife thinks its doctors fault they still don't know the cause but she blames Dr. b/c she says Dr. Z "should have read his prior med. notes b/c of the medicine Dr. prescribed", which he wasnt supposed to take.

There is no follow-up to this note in R.F.'s medical file, and the Government anticipates introducing testimony at trial that no one from Defendants' office followed-up with R.F.'s wife regarding the call and R.F.'s death.

P.B. died on or about April 19, 2004, approximately one month after R.F. Per her death certificate, P.B. died from cocaine and opiate intoxication – a drug overdose. At the time of her death, P.B. was receiving prescriptions for significant amounts of Schedule II controlled substances from the defendants, including Duragesic patches, Actiq lozenges and Percocet pills. The Government expects that Dr. Gilligan will testify at trial that P.B. was prescribed opioids outside of the usual course of professional practice. The Government further expects to introduce testimony that a witness (a Boston Police Department undercover officer) was present on or about May 11, 2004, when another person informed Zolot that P.B. had overdosed. Thus, at the time of the notice of P.B.'s overdose, Defendants had notice of at least three deaths tied to

---

[3] Sleep apnea is a condition that can be dangerously exacerbated by opioids. The Government would note that Mr. Dunphy had a similar condition, and died 17 months later after Defendant Pliner prescribed significant amounts of methadone to him following a bad drug test.

their prescribing practices within a period of three months.  The evidence will establish at trial that there was no evaluation or follow-up for any of these three early deaths noted in any of the three medical files.

Evidence of R.F.'s death is relevant and admissible as part of a significant timeline of events which establishes that Defendants were not seeking to properly treat individuals.  By early 2004, Defendants had notice of three suspicious deaths but took no steps to investigate or to modify their prescribing practices to avoid similar deaths/injuries from opioids.  Defendants simply ignored the deaths and continued providing prescriptions for substantial amounts of drugs to individuals for another three years.  Dr. Gilligan has testified that this failure to respond to notice of deaths is not consistent with a legitimate and proper medical practice.  This timeline of early deaths shows that Defendants were not legitimately prescribing opioids in good faith (i.e., to treat their patients) because they had notice that people were potentially dying from their prescribed drugs, and yet Defendants did not change the way that they prescribed.  It is stark evidence of Defendants' lack of good faith, and directly rebuts Defendants' primary defense.

## III.   THE COURT SHOULD ALLOW EVIDENCE OF DEFENDANTS' INCOME AS IT ESTABLISHES THEIR MOTIVE TO COMMIT THE CRIMES CHARGED AND REBUTS THEIR GOOD FAITH DEFENSE

The Government respectfully requests that the Court allow the Government to introduce at trial evidence as to Defendants' income and lifestyle.  This evidence is directly relevant to Defendants' motive to commit the crimes charges and specifically rebuts Defendants' defense that they acted solely in good faith because they cared about their patients.  This Court excluded this evidence at the last trial because there was no testimony relating to the average income of doctors and nurses in the Defendants' position.  Armed with this Court's ruling, Defendants argued in their opening and closing statements that the Government would not (and did not)

introduce any evidence of Defendants' motive to commit these crimes.  The Government is entitled to present evidence of motive, and should be allowed to introduce evidence of Defendants' significant financial gain to establish their motive to distribute controlled substances.

The First Circuit has found that the admission of income and lifestyle is appropriate to prove motive to commit a crime and to rebut a potential defense.  *See United States v. Derman*, 211 F.3d 175, 180 (1st Cir. 2000) (superseded on other grounds by statute).  In *Derman*, a marijuana trafficking case, the First Circuit found no error in the admission at trial of: (1) evidence related to a ski trip involving the defendant; (2) testimony about the defendant's lifestyle; (3) testimony about the defendant's property, possessions, and vacations; and (4) evidence concerning the purchases and possession of expensive jewelry.  *Id*. at 178-179. Affirming the admission of the evidence, the *Derman* court noted that the defendant's "motive was not only essential to the government's case, but also crucial to the defense …."  *Id*. at 180; *see also United States v. Appolon*, 695 F.3d 44, 60 (1st Cir. 2012) (evidence that defendant "used money derived from scheme to buy 'marijuana, clothes, vehicles and firearms' had special relevance because it established his motive for participating in the scheme – his need to finance a lavish lifestyle").

In *United States v. Caroni*, 2011 WL 4102343, *4 (N.D.Fl. Sept. 13, 2011), a case remarkably similar to the one at hand, the Court allowed the government to introduce evidence of wealth to demonstrate the defendant's motive for conspiring to distribute controlled substances through his pain management clinics.  *Id*.  The *Caroni* court concluded that because the defendant was "charged with conspiracy to distribute controlled substances and conspiracy to

commit money laundering and admittedly earned a substantial amount of money through the pain management clinics at issue," "evidence of Caroni's wealth [was] relevant to show motive and [] its probative value outweighs any danger of unfair prejudice." *Id*; *see also United States v. Hess*, 691 F.2d 984, 988 (11th Cir. 1982) (recognizing increase in personal wealth as goal of conspiracy); *United States v. Bradley*, 644 F.3d 1213, 1271-72 (11th Cir. 2011) (noting that "[t[he district court ha[s] broad discretion to admit the Government's 'wealth evidence' so long as it aid[s] in proving or disproving a fact in issue" and that "[c]onversely, the court's discretion to exclude evidence under Rule 403 is limited" and "the balance should be struck in favor of admissibility").

The specific evidence the Government seeks to introduce is the Defendants' own admissions made to law enforcement agents/officers about the amount of money they made in their respective roles at the Non-Surgical Orthopedic Center.  Zolot admitted to receiving between $600,000 and $800,000 per year in compensation from his medical practice, and Pliner admitted to receiving $165,000 in compensation plus bonuses (including a $20,000 bonus in 2006).  Zolot further admitted to owning two houses in Massachusetts and a condominium in Florida.  Notably, both Defendants only worked four days a week for this compensation.

This case is no different from *Derman* or *Caroni*.  Evidence of Defendants' income and lifestyle is critical to prove their motive to distribute controlled substances and to disprove their alleged good faith.  Defendants' financial motive for their illegal drug dealing is particularly relevant because at the last trial, Defendants' made their good faith, and the absence of evidence as to their motive, the cornerstone of their case.  Defendants repeatedly argued that they were practicing medicine in good faith and prescribing controlled substances solely for the benefit of

14

their patients.  This position is squarely contradicted by several pieces of evidence, but most

importantly the fact that Defendants were receiving a substantial financial benefit from their pain

practice, cumulatively worth hundreds of thousands of dollars.  This evidence, especially when

taken in context with other evidence to be presented at trial (including the receipt of gifts), rebuts

Defendants' claims of good faith in prescribing.

Defendants cannot have it both ways; they cannot claim that they acted in good faith with

the prescriptions they issued, but then preclude the jury from also learning about the substantial

financial benefits that they received from their prescribing practices.  Yet, this is exactly what

Defendants did in the last trial when the Court excluded evidence of their income:

- "The evidence in this case will be that Dr. Zolot opened up his practice to try to address the complaints of, as I said, literally thousands of people who came to him because they were suffering."  Transcript at 2-30:17-20.

- "Now, Dr. Zolot treated these people, each and every one of them, in good faith with their best interests at heart in the course of his medical practice, his legitimate medical practice."  *Id.* at 2-31:18-21.

- "Dr. Joseph Zolot is a good man who did his best to treat a very, very difficult population."  *Id.* at 2-60:14-16.

- "Lisa Pliner cared about her patients.  Lisa Pliner tried every single day to do the right thing."  *Id*. at 2-65:17-18.

- "She also believed that Dr. Zolot was passionately committed to caring for her patients."  *Id*. at 2-70:2-3.

- "You heard about him through patients he treated . . . Each and every one of them and others told you he was a caring and compassionate doctor."  *Id*. at 24-96:16-17.

- "I told you five and a half weeks ago that this is a good man who practiced in a very difficult area of medicine, and now witness after witness who are his patients and his own words have confirmed that to you."  *Id*. at 24-97:19-22.

- "So, you have to ask yourself:  Why would she do that?  Why would she decide to become a drug pusher?  After six more years of higher education, why would Lisa do that?  Well, I submit to you, ladies and gentlemen, there is a big fat hole in the government's case.  The government has completely failed to give you a scintilla of evidence as to why Nurse Pliner would do that.  What was her motive to abandon all of this hard work that she'd done and to immediately cross from the side of a legitimate practice of medicine to criminality?"  *Id.* at 24-135:10-18.

- "In fact, Mr. Crowley argued that that's why the defendants are guilty here, to make money.  So, now, you should ask yourselves, is the evidence of Lisa Pliner making one dime more than she would make as a practicing nurse in connection with this criminal drug conspiracy?  There is nothing, nothing, zero evidence whatsoever."  *Id.* at 24-136:1-5.

- "There is no evidence whatsoever that she received any more than her salary.  And I ask you to consider the fact, ladies and gentlemen, particularly in light of Mr. Crowley's argument, to ask yourself, how hard has the government tried to make the case that Nurse Pliner made a profit from this?"  *Id.* at 24-136:10-15.

- "Don't you think that they were working hard to try to find that there was some profit motive for Lisa Pliner, that she was going to make more than just an average nurse by throwing away her career as a medical practitioner and becoming a drug pusher?  Well, after nine, ten years' worth of effort, there's nothing, there's nothing, and I suggest that tells you right up front that this conspiracy theory that's alleged against Lisa is absurd.  There is no rational reason whatsoever why she would throw her professional career to the wind when there's no evidence she's making any money whatsoever other than her regular salary for doing her job."  *Id.* at 24-136:23-137:9.

Defendants squarely placed their good faith and the absence of motive in the Government's proof at issue in the last trial, and will surely do the same in the next trial.  For that reason, consistent with the case law on point, the Government should be allowed to introduce at trial evidence of Defendants' income from the Non-Surgical Orthopedic Center.

**IV.   THE COURT SHOULD ALLOW THE GOVERNMENT TO REDACT INADMISSIBLE HEARSAY FROM GOVERNMENT EXHIBIT 85 AND PRECLUDE PLINER FROM INTRODUCING HER OWN SELF-SERVING STATEMENTS**

The Government respectfully requests that the Court allow the Government to further redact inadmissible hearsay from Government Exhibit 85.  Government Exhibit 85 is an August 10, 2007 letter from Pliner to the Executive Office of Health and Human Services for the Commonwealth of Massachusetts.  The letter contains statements of Pliner that are admissible against her under Federal Rule of Evidence 801(d)(2)(a).  The Government intends to use at trial specific statements from Government Exhibit 85 against Pliner, and redact the remainder of the document because any other statements in the exhibits constitute inadmissible hearsay.  At the last trial, the Court admitted a redacted version of Government Exhibit 85, but allowed Pliner to include three paragraphs on her personal background.  These three paragraphs constitute inadmissible hearsay and should not be admitted.  Moreover, the doctrine of completeness does not mandate the introduction of these paragraphs because the statements the Government introduced does not include fragments or only portions of specific statements.

The exhibit at issue contains statements as to Pliner's patient evaluation and prescribing practices, the steps she took to prevent possible abuse and diversion of controlled substances, and her adherence to the Model Policy for the Use of Controlled Substances for the Treatment of Pain, adopted by the Board of Registration in Medicine in 2004.  While the Government is entitled to make use of Pliner's out-of-court statements under Federal Rule of Evidence 801(d)(2)(a), the same statements constitute inadmissible hearsay if offered by Pliner.  For that reason, the Government seeks to redact the three paragraphs of Government Exhibit 85 that relate to Pliner's personal background.

17

The doctrine of completeness does not provide a basis to introduce Pliner's personal background (as reflected in Government Exhibit 85) to the jury. "The doctrine of completeness does not permit the admission of otherwise inadmissible evidence simply because one party has referred to a portion of such evidence . . . ." *United States v. Awon*, 135 F.3d 96, 101 (1st Cir. 1998). The doctrine of completeness, codified at Federal Rule of Evidence 106, is only intended to permit "a party against whom a fragmentary statement is introduced [to] demand that the rest of the statement (or so much thereof as appropriate) be admitted into evidence in order to place the excerpt in context." *United States v. Millan*, 230 F.3d 431, 434 (1st Cir. 2000) (*quoting United States v. Houlihan*, 92 F.3d 1271, 1283 (1st Cir. 1996)). The Government does not intend to introduce mere fragments or incomplete portions of statements contained in Government Exhibits 85, and to the extent Pliner takes issue with the completeness of the statement being offered against her, she can add to that statement as necessary within the parameters of Federal Rule of Evidence 106.

## V.   THE COURT SHOULD LIMIT DEFENDANTS' OPENING STATEMENTS TO THOSE FACTS THE DEFENDANTS WILL PROVE AT TRIAL

The Government requests that Defendants be precluded from making opening statements regarding topics/facts which will not be proven at trial. At the prior trial, both Defendants made opening statements which covered numerous topics (including their background, their motivations, and their intent) for which they introduced no evidence at trial. Such opening statements should be excluded.

The First Circuit has instructed that the "purpose of an opening statement 'is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony.'" *United States v. Hershenow*, 680 F.2d 847, 857-58

(1st Cir. 1982) (quoting *United States v. Dinitz*, 424 U.S. 600, 612 (1976) (Burger, C.J.,

concurring)).  "'The function of the defendant's opening statement is to enable him to inform the

court and jury what he expects to prove ….'" *Id*. at 858 (citation omitted); *United States v.

McCabe*, 1997 WL 753348 at *4 (9th Cir. 1997) ("Opening statement should not refer to matters

that are not to be presented as evidence.").

        In the prior trial, both Defendants opened on several areas, but failed to introduce any

evidence at trial to support their opening statements.  Along these lines, Defendants opened on

such topics as: (1) their prior history in the Soviet Union; (2) their religion; (3) their "dreams;"

(4) discrimination that they faced in the Soviet Union; (5) various actions they took in the United

States prior to the time period at issue in this case; (6) their motivation in regard to the

prescriptions at issue in this case; (7) their intent in prescribing medications; (8) actions taken in

their practice, such as allegedly purchasing a dictation system; (9) that the drugs prescribed by

Defendants had nothing to do with several deaths which occurred in the practice; (10) statements

allegedly made by patients to Defendants; (11) alleged policies and practices of Defendants'

office; and (12) alleged statements made to each other.  These opening statements were highly

detailed and yet no competent evidence was introduced to support them at trial.  Defendants

never subjected themselves, and their stories, to cross-examination.  Rather, these factual

allegations were simply flung onto the jury.

        Defendants should be precluded from making similar opening statements at the next trial

unless they can establish that the statements will be backed by sufficient evidence.  Defendants

should not be permitted to throw out claims concerning their intent, motivation, background,

conversations, and events for which there will be no evidence introduced at trial.  The Supreme

19

Court has found that "[a]n improper opening statement unquestionably tends to frustrate the

public interest in having a just judgment reached by an impartial tribunal.  Indeed, such

statements create a risk, often not present in the individual juror bias situation, that the entire

panel may be tainted."  *Arizona v. Washington*, 434 U.S. 497, 512 (1978).  In addition,

Defendants should not be allowed to introduce these types of statements based upon their claim

that they *might* take the stand and testify to these points.

> It is urged that the opening statement should have been allowed to proceed and the
> evidence ruled on when offered.  Not if improper.  It must be kept within proper bounds,
> otherwise all manner of irrelevant and extraneous subjects could be stated to the jury and,
> in the absence of good faith, counsel could thus place before a jury much that he well
> knew could not later be introduced into evidence.

*Hallinan v. United States*, 182 F.2d 880, 885 (9th Cir. 1950).  As noted by Chief Justice Burger

in *Dinitz*,

> … [I]t is fundamentally unfair to an opposing party to allow an attorney, with the
> standing and prestige inherent in being an officer of the court, to present to the jury
> statements not susceptible of proof but intended to influence the jury in reaching a
> verdict.

*Dinitz*, 424 U.S. at 612 (Burger, C.J. concurring).

In light of the above, Defendants should be precluded from opening on topics which will

not be proven at trial.

**CONCLUSION**

For all the foregoing reasons, the Court should ALLOW the Government's motion *in limine*.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

Date: January 23, 2015                    By: */s/ Miranda Hooker*
                                          MICHAEL J. CROWLEY, BBO# 641235
                                          ERIC P. CHRISTOFFERSON, BBO# 654087
                                          MIRANDA HOOKER, BBO# 661569
                                          Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

I, Miranda Hooker, Assistant United States Attorney, do hereby certify that this document, filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on this date.

*/s/ Miranda Hooker*
MIRANDA HOOKER
Assistant U.S. Attorney